821 F.2d 171
 Daniel Chee-Chung CHONG, Grace Hsiu-Chen Lay Chong, Alice
Ai-Hua Chong, William Hsuan-Hua Chong and
Christina Chih-Hua Chong, Appellants,
v.
DIRECTOR, UNITED STATES INFORMATION AGENCY and District
Director, Immigration and Naturalization Service,
Pittsburgh, Defendants.
 No. 86-3651.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
May 11, 1987.
 Decided June 5, 1987.
 
 Richard D. Steel, Ann A. Ruben, Orlow, Fuller, Rubin & Steel, Philadelphia, Pa., for appellants.
 J. Alan Johnson, U.S. Atty., C. Normand Poirier, Acting Gen. Counsel, Joseph A. Blundon, Asst. Gen. Counsel, Carol B. Epstein, Attorney-Adviser, U.S. Information Agency, Washington, D.C., for defendants.
 Before GIBBONS, Chief Judge, MANSMANN, Circuit Judge and KATZ, District Judge*.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Daniel Chee-Chung Chong, M.D. appeals from an order dismissing his complaint against the Director of the United States Information Agency (USIA) and the District Director of the Immigration and Naturalization Service (INS). The district court held that it did not have subject matter jurisdiction to review the USIA's denial of a favorable recommendation on Dr. Chong's request for a waiver of the two-year home-country residence requirement of 8 U.S.C. Sec. 1182(e) (Supp. III 1985). Chong contends that the USIA's decision not to recommend a waiver is subject to judicial review, albeit a limited one and that the USIA Director abused his discretion in refusing to recommend a waiver in this case because the INS made a finding of extreme hardship and there is no negative impact on foreign policy. While we agree that the decision of the USIA not to recommend a waiver is subject to a circumscribed standard of review under 5 U.S.C. Sec. 706(2)(A) (1982), we disagree that the USIA abused its discretion in not recommending a waiver in this case. Thus, we affirm.
 
 I.
 
 2
 On September 23, 1977, Dr. Daniel Chong with his wife, Grace, and their daughter, Alice, pursuant to 8 U.S.C. Sec. 1101(a)(15)(J) (1982), entered the United States as non-immigrant exchange visitors on J-1 and J-2 visas, respectively. Dr. Chong came from Hong Kong to participate in the Exchange Visitor Program authorized by the USIA under 22 U.S.C. Sec. 2452 (1982), planning to pursue graduate medical training as a resident in general surgery at the University of Massachusetts. He received annual extensions of his visa to continue his residency there through June 30, 1980. Thereafter, Dr. Chong's visa was further extended through June 30, 1982 so that he could complete his fourth- and fifth-year residencies at McKeesport Hospital in McKeesport, Pennsylvania. In the meantime, the Chongs had two other children. Their son, William Hsuan-Hua Chong was born in Worcester, Massachusetts on September 19, 1978, and their daughter, Christina Chih-Hua Chong was born on November 7, 1980 in McKeesport, Pennsylvania. Both William and Christina are therefore citizens of the United States.
 
 
 3
 Ordinarily, upon completion of his studies, a participant in the Exchange Visitor Program must return to the country of his nationality or of his last residence for at least two years before he may apply for permanent resident status in the United States. 8 U.S.C. Sec. 1182(e). Section 1182(e) provides, however, for the following exceptions:
 
 
 4
 ... upon the favorable recommendation of the Director of the United States Information Agency, pursuant to the request of an interested United States Government agency, or of the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien), or that the alien cannot return to the country of his nationality or last residence because he would be subject to persecution on account of race, religion, or political opinion, the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest. And provided further, That, except in the case of an alien described in clause (iii), the Attorney General may, upon the favorable recommendation of the Director of the United States Information Agency, waive such two-year foreign residence requirement in any case in which the foreign country of the alien's nationality or last residence has furnished the Secretary of State a statement in writing that it has no objection to such waiver in the case of such alien.
 
 
 5
 8 U.S.C. Sec. 1182(e).
 
 
 6
 Thus, on June 29, 1982, Dr. Chong applied to the INS for a waiver of the two-year foreign residence requirement, alleging exceptional hardship to his two American-citizen children. Dr. Chong claimed that he would not be permitted to practice medicine in Hong Kong because he lacked the requisite certification from the United Kingdom and submitted a letter from the Medical Council of Hong Kong as proof. On May 6, 1983 the INS, referring to Dr. Chong's claim of hardship,[1] sent a request for a recommendation of a section 212(e) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1182(e), waiver to the USIA which also contained the following statement: "Subject produced a letter dated May 1982 from the Medical Council Secretary, Hong Kong, which does not conclusively prove that he cannot practice medicine in Hong Kong." Form 1-613 dated May 6, 1983. On July 28, 1983, the USIA declined to make a favorable recommendation, reasoning that "[i]t is not felt the hardship outweighs the intent of Public Law 94-484. The letter that Dr. Chong provided does not conclusively prove that he will not be able to practice medicine." Form 1-613 dated July 28, 1983. Accordingly, on August 25, 1983 the District Director of INS, Pittsburgh, Pennsylvania[2] denied the waiver based on the USIA's declination to issue a favorable recommendation.
 
 
 7
 On January 30, 1984, Dr. Chong requested that the USIA reconsider its position, submitting another letter from the Medical Council of Hong Kong which stated that Dr. Chong would have to obtain full registration from the United Kingdom before he would be eligible to practice medicine in Hong Kong. In response, the USIA orally advised Dr. Chong that it would not change its position.
 
 
 8
 On April 22, 1985, Dr. Chong filed the instant suit against the USIA Director and the INS District Director in the United States District Court for the Western District of Pennsylvania. Specifically, Dr. Chong challenged the USIA's refusal to make a favorable recommendation with respect to his application for a waiver of the two-year foreign residence requirement of 8 U.S.C. Sec. 1182(e). The district court held that the USIA's recommendation function pursuant to section 1182(e) is not judicially reviewable, thereby dismissing Dr. Chong's action for lack of subject matter jurisdiction.
 
 II.
 A. Reviewability
 
 9
 On appeal, Dr. Chong alleges that the USIA's decision not to recommend a waiver is subject to judicial review because there is "law to apply" as set forth in the agency's own regulations. In the alternative, Dr. Chong argues that even if this court finds that there is "no law to apply," the USIA decision is nonetheless subject to judicial review under fundamental precepts of administrative law which mandate reasoned decisions, decisions which are consistent with congressional intent and which do not markedly deviate from existing policy unless articulated reasons for the change are given.
 
 
 10
 This case presents the tension between two provisions in the Administrative Procedure Act (APA). Section 701(a)(2) of Title 5 of the United States Code precludes judicial review of any "agency action [which] is committed to agency discretion by law." 5 U.S.C. Sec. 701(a)(2) (1982). Section 706(2)(A), however, permits judicial review of agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). Recently, in Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court construed section 701(a)(2) and addressed its apparent conflict with section 706(2)(A):
 
 
 11
 ... even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely. This construction avoids conflict with the "abuse of discretion" standard of review in Sec. 706--if no judicially manageable standards are available for judging how and when an agency should exercise its discretion then it is impossible to evaluate agency action for "abuse of discretion."
 
 
 12
 Heckler v. Chaney, 470 U.S. at 830, 105 S.Ct. at 1655. As the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, stated "[t]he legislative history of the Administrative Procedure Act indicates that [5 U.S.C. Sec. 701(a)(2) ] is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). Thus, in order to find that an agency action is not subject to judicial review, we must find that there are no judicially manageable standards against which a court may judge whether an agency abused its discretion.[3]
 
 
 13
 Pointing to the language of the statute in question here, appellees maintain that there is "no law to apply" because section 1182(e) merely states "[t]hat ... upon the favorable recommendation of the Director of the United States Information Agency," 8 U.S.C. Sec. 1182(e), the Attorney General may grant a waiver of the two-year foreign residency requirement. Certainly, this statutory language alone provides no guideline to the USIA on how to decide its recommendations, and likewise sets forth no standards against which a court may judge whether the USIA abused its discretion. The USIA itself, however, has adopted regulations which delineate the procedure it must use to review waiver requests. 22 C.F.R. Sec. 514.31(b)(2) (1986) requires the INS to submit its findings of hardship "together with a summary of the details of the expected hardship ... to the Waiver Review Branch" of the USIA for the Director's recommendation. Furthermore, 22 C.F.R. Sec. 514.32 (1986) provides that "[u]pon receipt of a request for a recommendation of waiver ... the Director will review the policy, program, and foreign relations aspects of the case and will transmit a recommendation to the Attorney General for decision."
 
 
 14
 Although the Ninth Circuit in Abdelhamid v. Ilchert, 774 F.2d 1447 (9th Cir.1985), commented that "this regulation raises no legal issues for review," id. at 1450, we disagree. We hold, instead, that these regulations provide sufficient guidance to make possible judicial review under an abuse of discretion standard.[4] See Dina v. Attorney General, 793 F.2d 473, 477 (2d Cir.1986) (per curiam) (Oakes, J., concurring). We are aware that our decision today is contrary to those of the two other circuits, see Dina v. Attorney General, 793 F.2d 473 (2d Cir.1986); Abdelhamid v. Ilchert, 774 F.2d 1447 (9th Cir.1985), and the various district courts which have considered this exact question. See Ait-Kaci v. USIA, No. 86-0583 (D.D.C. July 11, 1986), appeal docketed, No. 86-5610 (D.C.Cir. Sept. 29, 1986); Taube v. Attorney General, No. 85-CV-613 (N.D.N.Y. May 20, 1987); Baquero v. Attorney General, No. 86-0692 (D.D.C. Mar. 27, 1986), appeal docketed, No. 86-5335 (D.C.Cir. June 2, 1986); Slyper v. Attorney General, No. 82-3048 (D.D.C. Mar. 26, 1986), appeal docketed, No. 86-5331 (D.C.Cir. June 2, 1986); El-Omrani v. Director, USIA, 638 F.Supp. 430 (W.D.Pa.1986); Nwankpa v. Kissinger, 376 F.Supp. 122 (M.D.Ala.1974), aff'd mem., 506 F.2d 1054 (5th Cir.1975).
 
 
 15
 In so holding, however, we recognize that our scope of review of the USIA's recommendation function under section 1182(e) is severely limited because the statute and the USIA's regulations vest rather broad discretion in the Director of the USIA. As the USIA itself concedes, however, its role is to determine the policy, program, and foreign relations aspects of a case, weigh them against the hardship determined by the INS and make a favorable recommendation for waiver if the hardship clearly outweighs the other aspects. The extent of our review, therefore, is limited to whether the USIA followed its own guidelines.[5]
 
 B. Merits
 
 16
 Viewing the facts of this case in light of the constrained standard of review articulated above, we cannot say that the USIA abused its discretion in not making a favorable recommendation with respect to Dr. Chong's waiver request. In refusing to make a favorable recommendation, the USIA reasoned that "[i]t is not felt the hardship outweighs the intent of Public Law 94-484. The letter that Dr. Chong provided does not conclusively prove that he will not be able to practice medicine." Form 1-613 dated July 28, 1983. While this statement is not very specific, it does indicate that the USIA "review[ed] the policy, program, and foreign relations aspects of the case." 22 C.F.R. Sec. 514.32 (1986). That is all that is required by the USIA's regulations. Moreover, we agree that the evidence submitted by Dr. Chong does not demonstrate that he would be denied British certification to practice medicine in Hong Kong. Dr. Chong never asserted or submitted any evidence that he in fact applied for British certification and was denied it.[6]
 
 
 17
 Dr. Chong also argues that the USIA's decision was based on a misinterpretation of congressional intent and was without a reasoned explanation. These inquiries, of course, are separate and quite apart from whether the agency abused its discretion in reaching its decision. Although the USIA's explanation for its decision is not as particularized as we might like, we see no reason in this case for requiring more. Because cases involving the Exchange Visitor Program necessarily implicate foreign policy concerns and involve an agency exercising its discretionary powers in that respect, we conclude that a more particularized explanation by the USIA is not required. See Dina v. Attorney General, 793 F.2d 473, 478 (2d Cir.1986) (per curiam) (Oakes, J., concurring).
 
 
 18
 Moreover, Dr. Chong's contentions that the USIA misinterpreted legislative intent with respect to foreign medical graduate students and that, in making its decision, the USIA somehow departed from an allegedly well-settled policy of providing waivers when the INS found exceptional hardship are without merit. While Dr. Chong insists that we should remand to give him an opportunity to prove what he characterizes as a "recent and dramatic change in policy" on the part of the USIA, see Appellant's Brief at 17, we find that unnecessary in view of our conclusion that both the legislative intent and USIA policy were followed.
 
 
 19
 The USIA is not an immigration agency. Its mission, as promulgated in 22 U.S.C. Sec. 1461-1 (1982), is "to further the national interest by improving United States relations with other countries and peoples through the broadest possible sharing of ideas, information, and educational and cultural activities."
 
 
 20
 Likewise, the Exchange Visitor Program under which Dr. Chong entered the United States is not an immigration program but rather is designed to "strengthen international cooperative relations" by providing for educational exchanges between the United States and other countries. See 22 U.S.C. Sec. 2452. First authorized by the United States Information and Educational Exchange Act of 1948 (Smith-Mundt Act), see Pub.L. No. 402, 66 Stat. 6 (1948), the Exchange Visitor Program, as originally enacted, required that the foreign exchange student return home upon the expiration of his visa. See 22 U.S.C. Sec. 1446 (1952).
 
 
 21
 Because exchange visitors were increasingly finding ways to circumvent their non-immigrant visitor status, thereby lawfully remaining in the United States, in 1956, Congress enacted the present requirement that all exchange visitors return to their home country for at least two years before applying for an immigrant visa. See Pub.L. No. 84-555, 70 Stat. 241 (1956). The Senate Foreign Relations Committee reasoned that "[t]he effect of [exchange visitors remaining in the United States] is to defeat the primary objective of the exchange program, namely, that those individuals who are brought to the United States will return ... to their own ... country to impart to their friends and the society in which they live impressions of the United States and its culture." S.Rep. No. 1608, 84th Cong., 2d Sess. 2, reprinted in 1956 U.S.Code Cong. & Admin.News 2662, 2663. The amendment, therefore, was intended to "make perfectly clear ... that the exchange program is not an immigration program and should not be used to circumvent the operation of the immigration laws." Id. at 2-3, reprinted in 1956 U.S.Code Cong. & Admin.News 2663. Congress also provided for a waiver of the two-year residency requirement in certain circumstances.
 
 
 22
 Initially, the waiver provision was liberally applied by the State Department.[7] Between June 1956 and the end of 1960, it recommended approval for 2,104 of 2,674 waiver applications. See H.R.Rep. No. 721, 87th Cong., 1st Sess. 81 (1961). Congress, however, strongly disapproved of this lenient policy, stating:
 
 
 23
 It is believed to be detrimental to the purposes of the program and to the national interests of the countries concerned to apply a lenient policy in the adjudication of waivers including cases where marriage occurring in the United States or the birth of a child or children, is used to support the contention that the exchange alien's departure from this country would cause personal hardship.
 
 
 24
 * * *
 
 
 25
 [I]t is axiomatic with this subcommittee that a person who has come to the United States to learn in order to give his countrymen the benefit of such education should not be permitted to evade the "return home" rule.
 
 
 26
 Id. at 121-22 (emphasis in original). Congress then repealed section 201 of the Smith-Mundt Act, replacing it with section 212(e) of the Immigration and Nationality Act, 8 U.S.C. Sec. 1182(e), which tightened the language regarding waivers and established the current three-step process for obtaining a waiver.
 
 
 27
 By 1970, Congress realized that blanket application of the two-year foreign residence requirement to all exchange visitors was inappropriate, especially where the United States had a need for the visitor's skills and his home country had no objection to his remaining here. Section 1182(e) was therefore amended to require the two-year residency only of those whose participation in the program was financed by the United States or the visitor's home country or those whose home country needed their services. Also added was the provision authorizing a grant of waiver if the home country stated in writing that it did not object to the visitor remaining in the United States. See Pub.L. No. 91-225, Sec. 2, 84 Stat. 128, 129 (1970).
 
 
 28
 In 1976, however, Congress found an increasing influx of foreign doctors coming into the United States as immigrants immediately after their participation in the Exchange Visitor Program. See H.R.Rep. No. 266, 94th Cong., 2d Sess. 50, reprinted in 1976 U.S.Code Cong. & Admin.News 4947, 4991. Not surprisingly, nations were beginning to refuse to participate in the medical exchange program, fearing permanent loss of their doctors. See id., reprinted in 1976 U.S.Code Cong. & Admin.News 4992. In turn, the United States began to lose the benefits of the program, including enhancement of international relations, timely acquisition of medical advances made in other countries and its worldwide market for U.S. health products. See U.S. Dep't of Health & Human Services, Report to Congress on Physician Exchange Visitor Program xiii (1983).
 
 
 29
 Consequently, after commenting "that there is no longer an insufficient number of physicians and surgeons in the United States such that there is no further need for affording preference to alien physicians and surgeons in admission to the United States under the Immigration and Nationality Act," Pub.L. 94-484, Sec. 2(c), 90 Stat. 2243 (1976), Congress tightened the immigration laws for foreign doctors who entered the United States under J visas, see Pub.L. No. 94-484, Sec. 601, 90 Stat. 2300, 2300-03. Public Law 94-484 affected physician exchange visitors by 1) requiring them, prior to entering the United States, to commit in writing to return to their home country upon completion of their training, 8 U.S.C. Sec. 1182(j)(1)(C) (1982); 2) requiring their home country to provide written assurances of its need for the specific skills to be taught the visitor in the United States, id.; 3) requiring foreign exchange doctors to return home for two years regardless of the source of their financing, 8 U.S.C. Sec. 1182(e); and 4) not allowing them to obtain waivers on the basis of "no objection" letters from their home country, id. As Dr. Chong correctly maintains, however, the availability of the hardship waiver remained intact.
 
 
 30
 In 1981, in reaction to "the flagrant abuse of the exchange program during the past decade and ... to alleviate possible 'brain drain' from various countries," Congress again enacted additional measures with respect to exchange-visitor physicians. See H.R.Rep. No. 264, 97th Cong., 1st Sess. 16, reprinted in 1981 U.S.Code Cong. & Admin.News 2577, 2585. Exchange-visitor doctors must now submit an annual affidavit to the Attorney General stating that they will return to their home country. See 8 U.S.C. Sec. 1182(j)(1)(E) (1982). Moreover, they are no longer eligible to apply for suspension of deportation. See 8 U.S.C. Sec. 1254(f) (1982).
 
 
 31
 Although the hardship waiver provision itself was not changed with respect to exchange-visitor doctors, it is clear from Congress's actions in 1976 and 1981 that it intended that waivers not be granted leniently. In both the 1976 and 1981 amendments, Congress singled out this group of exchange visitors--physicians--and imposed harsher restrictions on their ability to remain in the United States after they complete their studies than have been imposed on any other group.[8] Thus, we find that USIA's decision not to make a favorable recommendation in this case did not disregard congressional intent or policy.[9]
 
 III.
 
 32
 While we are sympathetic to the Chong family's desire to remain in the United States, the fact is that Dr. Chong made a bargain with the United States and the USIA, within its broad discretionary powers, has properly determined that the bargain must be kept. Thus, the judgment of the district court will be affirmed.
 
 
 
 *
 Hon. Marvin Katz, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Although the request for a recommendation of a section 212(e) waiver is somewhat ambiguous as to whether the INS actually made a determination of hardship, the USIA apparently proceeded on the assumption that the INS had made such a determination. We, therefore, also proceed on that assumption
 
 
 [2]
 The Attorney General's authority to grant waivers under section 212(e) of the Immigration and Nationality Act is delegated to the Commissioner of Immigration and Naturalization, see generally 8 C.F.R. Sec. 100.6 (1987), who in turn has delegated that authority to the District Directors, see 8 C.F.R. Sec. 103.1(n) (1987)
 
 
 [3]
 We agree with Judge Oakes' concurrence in Dina v. Attorney General, that Heckler v. Chaney does not stand for the proposition that section 701(a)(2) precludes judicial review in a large number of cases. See Dina, 793 F.2d at 477. Moreover, we believe that Chaney did not change the presumption of reviewability of agency action under the APA. See, e.g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967); Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574, 578 (3d Cir.1979). Chaney merely held that when Congress does not provide guidelines for the exercise of enforcement discretion, an agency's refusal to institute proceedings is presumptively unreviewable under Sec. 701(a)(2). See Heckler v. Chaney, 470 U.S. at 838, 105 S.Ct. at 1659
 
 
 [4]
 Our holding is consistent with Local 2855, AFGE (AFL-CIO) v. United States, 602 F.2d 574 (3d Cir.1979), and Hondros v. United States Civil Service Commission, 720 F.2d 278 (3d Cir.1983), in which we prescribed three criteria to be considered when determining the reviewability of an agency action. To be held unreviewable, an agency action must 1) involve broad discretion not just some discretion, Local 2855, supra, at 578; 2) be "the product of political, military, economic, or managerial choices that are not really susceptible to judicial review," id. at 579; and 3) the challenge to such action must not involve "charges that the agency lacked jurisdiction, that the agency's decision was occasioned by impermissible influences, such as fraud or bribery, or that the decision violates a constitutional, statutory or regulatory command," id. at 580. The challenge in the instant appeal involves a charge that the USIA did not conform to its own regulations governing its recommendation function
 
 
 [5]
 We reject the USIA's argument that its recommendation function is not susceptible to judicial review because it is the product of political choices made in the context of foreign policy. In the instant case the foreign relations considerations are quite minimal. Neither Hong Kong (the country of Dr. Chong's nationality) nor Taiwan (the country of Dr. Chong's last residence) have any objections to Dr. Chong's remaining in the United States. Moreover, Dr. Chong received no government financing. Indeed, the USIA admitted that in the instant case, policy and program considerations, rather than foreign relations aspects, prompted its determination not to make a favorable recommendation. See USIA's Answers to Interrogatories dated October 24, 1985
 
 
 [6]
 Dr. Chong quarrels with the USIA's determination that he did not "conclusively" prove his inability to practice in Hong Kong, insisting that only a preponderance of the evidence is required. Because we review the USIA's decision under an abuse of discretion standard, Dr. Chong's argument is irrelevant
 
 
 [7]
 The Exchange Visitor Program was originally administered by the State Department. Administration of the program and the functions of the Secretary of State with respect to waivers were transferred to the USIA Director. See Exec.Order No. 12,048, 3 C.F.R. Secs. 168-69 (1978), reprinted in 22 U.S.C. Sec. 1461 app. at 210-14 (1982), amended by Exec.Order No. 12,388, 3 C.F.R. Secs. 225-26 (1982), reprinted in 22 U.S.C. Sec. 1461 app. at 214 (1982)
 
 
 [8]
 To the extent that Dr. Chong argues that the USIA departed from its own policy of leniency in making favorable recommendations, the record shows, and Chong does not dispute, that a small percentage of exchange visitor doctors are denied recommendation if proper substantiation of hardship is not supplied. See INS Efficiency Legislation: Hearing Before the Subcomm. on Immigration, Refugees, and Int'l Law of the Comm. on the Judiciary, 97th Cong., 1st Sess. 81, 96-97 (1981) (statement of C. Normand Poirier, USIA Deputy General Counsel). As stated supra, this is such a case. Therefore, we conclude that the USIA followed its own policy as well
 
 
 [9]
 Because we conclude that the USIA did not depart from well-settled policy, we need not address Dr. Chong's additional contention that dramatic changes in policy must be accompanied by articulated reasons