C.K., on her own behalf and as guardian ad litem for her baby S.B., and her daughter J.M.; J.W., on her own behalf and as guardian ad litem for her baby E.W. and her son J.W.; E.P., on her own behalf and as guardian ad litem for her baby I.P. and her son R.P.; E.M., on her own behalf and as guardian ad litem for her baby B.M. and her daughter C.G.; H.K., on her own behalf and as guardian ad litem for her babies T.H., D.H. and D.H. and other sons S.H. and J.H.; E.S. and G.S., on their own behalf and as guardian ad litem for their baby boy B.S., son C.S. and their daughter C.S.; M.M. on her own behalf and as guardian ad litem for her daughter A.P. and her son A.R., on behalf of themselves and all other similarly situated

v.

Donna SHALALA, Secretary, United States Department of Health and Human Services, in her official capacity; The United States Department of Health and Human Services; New Jersey Department of Health and Human Services; William Waldman, Commissioner, New Jersey Department of Health and Human Services in his official capacity.

Civ. A. No. 93–5354 (NHP).

United States District Court,
D. New Jersey.

May 4, 1995.

Melville D. Miller, Jr., President David G. Sciarra, Legal Services of N.J., Inc., Edison, NJ, Martha F. Davis, Deborah A. Ellis, Now Legal Defense and Educ. Fund, New York City, Lawrence S. Lustberg, Jonathan Romberg, on Behalf of the ACLU–NJ, Crummy,

Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for plaintiffs.

Sheila M. Lieber, Margaret H. Plank, U.S. Dept. of Justice, Civ. Div., Washington, DC, Susan C. Cassell, Asst. U.S. Atty., Faith S. Hochberg, U.S. Atty., Newark, NJ, for defendants Donna Shalala, Secretary of U.S. Dept. of Health and Human Services, and U.S. Dept. of Health and Human Services.

Dennis J. Conklin, Sr. Deputy Atty. Gen., Benjamin Clarke, Asst. Atty. Gen., Michael J. Haaas, Sr. Deputy Atty. Gen., Emerald L. Kuepper, Deputy Atty. Gen., Deborah T. Poritz, Atty. Gen. of N.J., Trenton, NJ, for defendants William Waldman, Com'r of Human Services, and State of N.J. Dept. of Human Services.

Daniel J. Popeo, David A. Price, Wash. Legal Foundation, Washington, DC, Peter T. Manzo, Edison, NJ, for amici curiae The Wash. Legal Foundation and The Lincoln Institute for Research and Educ., Inc. in support of defendants' Motion for Summary Judgment.

Anthony J. Tomari, Hannoch Weisman, Roseland, NJ, William H. Mellor, III, Clint Bolick, Dana Berliner, Institute for Justice, Washington, DC, for amici curiae The American Legislative Exchange Council, The Empowerment Network Foundation, The Independent Women's Forum, Bethsai Towshend, Toya Pettey, Nicole Green, Tomikka Simmons and Shantina Delvalle, in support of defendants' Motion for Summary Judgment.

Nadine Taub, Women's Rights Litigation Clinic, Newark, NJ, Maureen E. O'Bryon, Michael L. Whitener, Jeffrey G. Schneider, Laura E. Loeb, Jonathan S. Franklin, Jody Foster, Hogan & Hartson, Washington, DC, Judith L. Lichtman, Joan Entmacher, Joanne L. Hustead, Women's Legal Defense Fund, Washington, DC, for amici curiae The Women's Legal Defense Fund, Advocates for Youth, Catholics for a Free Choice, The Center for Reproductive Law and Policy, Coalition of Labor Union Women, The Fund for the Feminist Majority, Intern. Ladies' Garment Workers' Union, Nat. Abortion and Reproductive Rights Action League, The Nat. Black Women's Health Project, The Nat. Council of Jewish Women, Inc., The Nat. Council of Negro Women, Inc., The Nat. Family Planning and Reproductive Health Ass'n, The Nat. Gay and Lesbian Task Force, The Pro–Choice Resource Center, The Religious Coalition for Reproductive Choice, and Right to Choose in N.J. in support of plaintiffs' Motion for Summary Judgment.

Evan A. Davis, Lynn A. Dummett, Lawrence T. Gresser, Marcia L. Narin, Yves P. Denize, Cleary, Gottlieb, Steen and Hamilton, New York City, for amici curiae Ass'n for Children of N.J., The Nat. Organization for Women (NOW–NJ), American Friends Service Committee, The Lutheran Office of Governmental Ministry in N.J., The Nat. Ass'n of Social Workers, Inc., The Child Care Law Center, The Child Welfare League of America, The Food Research and Action Center, and The Nat. Ass'n of Child Advocates in support of plaintiffs' Motion for Summary Judgment.

Rand E. Rosenblatt, Robert F. Williams, Rutgers University Law School, Camden, NJ, for amici curiae The Nat. Com'n for the Protection of Human Subjects of Biomedical and Behavioral Research, and The President's Com'n for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research in support of plaintiffs' Motion for Summary Judgment.

Richard J. Traynor, Russell J. Passamano, Legal Center for Defense of Life, Inc., Morristown, NJ, for amici curiae N.J. Right to Life Committee, Inc., and Citizens Concerned for Life, Inc. in support of plaintiffs' Motion for Summary Judgment.

Shirley D. Brandman, Kathleen A. Sullivan, The Jerome N. Frank Legal Services Organization, New Haven, CT, Lucy A. Williams, Northeastern University School of Law, Boston, MA, for amici curiae Puerto Rican Legal Defense and Educ. Fund, Society of American Law Teachers, Wider Opportunities for Women, and Women and Poverty Project in support of plaintiffs' Motion for Summary Judgment.

POLITAN, District Judge.

Plaintiffs, residents of New Jersey currently receiving welfare funding via the Aid to Families with Dependent Children ("AFDC") program, challenge the exercise

by the Secretary of the United States Department of Health and Human Services ("HHS") of her discretionary authority pursuant to § 1115 of the Social Security Act, 42 U.S.C. § 1315(a), which permits the Secretary to waive state plan requirements of the Act to enable individual states to test reforms to their AFDC programs via demonstration projects.[1] Specifically, plaintiffs challenge the Secretary's grant of waivers to the state of New Jersey in July 1992 to allow implementation of the state's Family Development Program ("FDP") which, *inter alia*, contains the so-called Family Cap provision, an amendment to existing state law that eliminates the standard increase provided by AFDC for any child born to an individual currently receiving AFDC.

Plaintiffs have presently moved this Court to enter summary judgment on their behalf and thereby permanently enjoin the Family Cap and vacate the Secretary's waiver insofar as it authorizes the state to implement the cap. They assert that the Secretary violated the Administrative Procedure Act ("APA") by failing to provide in the administrative record any explanation of her resolution of the relevant issues concerning the state's application for the waiver. Moreover, plaintiffs assert that as a matter of law the Family Cap violates (1) the APA since the Secretary exceeded her statutory authority in approving a waiver under § 1315(a); (2) various provisions of the Social Security Act and implementing regulations; (3) HHS regulations protecting human subjects in experiments that involve pregnant women and fetuses; and (4) the Equal Protection and Due Process Clauses of the United States Constitution.

Defendants, the United States Department of Health and Human Services and its Secretary Donna Shalala, along with the New Jersey Department of Human Services ("DHS") and its Commissioner William Waldman, oppose the plaintiffs' motion and have cross-moved for summary judgment dismissing the Complaint. Defendants argue that the Secretary's grant of waivers to the state of New Jersey to implement the FDP reflected a reasoned judgment that the reforms proposed by the state were likely to promote the salutary objective of the AFDC program, namely breaking the cycle of poverty for AFDC recipients, enhancing their individual responsibility, and strengthening their family structure. Moreover, defendants contend that New Jersey's Child Exclusion program does not violate any statutory or constitutional provisions. I heard oral argument with respect to these competing motions on January 27, 1995 and reserved decision. For the reasons expressed herein, defendants' motion for summary judgment dismissing the Complaint is **GRANTED** and plaintiffs' motion for summary judgment is **DENIED**.

## I. BACKGROUND

AFDC is a joint federal and state program established under Title IV–A of the Social Security Act, 42 U.S.C. § 601 *et seq.*, to "enabl[e] each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living...." 42 U.S.C. § 601. Under that program, if the state submits an AFDC state plan that meets the requirements of 42 U.S.C. § 602, the federal government reimburses it for a portion of the benefits it provides to aid recipients. In other words, the state will receive federal matching funds if it has in effect an AFDC plan that comports fully with the Social Security Act.

The AFDC statutes create a "scheme of cooperative federalism" in which states are given "considerable latitude" in the

1. On June 1, 1994 this Court entered an Order certifying a plaintiff class consisting of all individuals in AFDC recipient families in New Jersey (a) in which an adult member of the family has conceived or will conceive a child anytime after October 1, 1992; (b) which were receiving AFDC at the time the child was conceived; and (c) in which an adult member (i) has given or will give birth to a child after August 1, 1993, (ii) has had her pregnancy terminated or will have her pregnancy terminated because her child, if born, would be subject to the Child Exclusion, or (iii) is still pregnant. In addition, three subclasses were certified: (1) adult family members who become pregnant; (2) children born after August 1, 1993 subject to the Family Cap; and (3) all other children of the family.

administration of their own programs. *King v. Smith,* 392 U.S. 309, 316–19, 88 S.Ct. 2128, 2133–34, 20 L.Ed.2d 1118 (1968). To determine eligibility, each state sets as a "standard of need" an "amount deemed necessary by the State to maintain a hypothetical family at a subsistence level." *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974). A family otherwise eligible for AFDC qualifies for benefits if its "countable" income (*i.e.,* its income after various deductions for work-expenses, child-care and other purposes are subtracted, 42 U.S.C. § 602(a)(8)) is less than the standard of need. A state need not, however, pay the full difference between income and standard of need; each state is free to determine a maximum assistance payment. That payment may be set, for instance, as a fixed percentage of the standard of need, or as the "dollar maximums on the amount of public assistance payable to any one individual or family." *Rosado v. Wyman,* 397 U.S. 397, 408–09, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970).

"The AFDC provisions of the Social Security Act envision aid to strengthen the entire family unit, including the dependent child's parent, so as to encourage the care of the child within his [or her] own home." *Doe v. Gillman,* 479 F.2d 646, 648 (8th Cir.), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3073, 41 L.Ed.2d 668 (1974) (citing 42 U.S.C. § 601). Within the AFDC legislation itself Congress has declared that it authorized familial financial aid:

> [f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection....

42 U.S.C. § 601.

Congress has realized that the rigidity of statutory and regulatory requirements emanating from its marble halls "often stand[s] in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients." S.Rep. No. 1589, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.Cong., Code & Admin.News 1943, 1961 (1962). Accordingly, Congress added a new § 1115 to the Social Security Act in the Public Welfare Amendments of 1962, Pub.L. No. 87–543, 76 Stat. 192. Section 1115 provides in relevant part that:

> (a) In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of subchapter I, X, XIV, XVI, or XIX of this chapter, or Part A or D of subchapter IV of this chapter, in a State or States—
>
> > (1) the Secretary may waive compliance with any of the requirements of section 302, 602, 654, 1202, 1352, 1382 or 1396a of this title, as the case may be, to the extent and for the period he [or she] finds necessary to enable such State or States to carry out such project ...

42 U.S.C. § 1315(a).

New Jersey's AFDC program is administered by the state's DHS. Effective July 1, 1992, the New Jersey Legislature enacted the Family Development Plan ("FDP"), N.J.S.A. 44:10–19 to –33, N.J.S.A. 44:10–3.3 to –3.8. The FDP aims to reduce welfare dependency by, *inter alia,* developing educational and vocational skills. To advance these goals, this aspect of the FDP mandates that the implementing state and county agencies provide individual recipients with contracts tailored to the individuals' needs, providing the recipients such services as:

> job development and placement in full-time permanent jobs ... counseling and vocational assessment; intensive remedial education, including instruction in English-as-a-second language; financial and other assistance for higher education ...; job search assistance; community work experience; employment skills training focused on a specific job; and on-the-job training in an employment setting.

N.J.S.A. 44:10–25(b). The job training and education programs created by the FDP for New Jersey's AFDC recipients ("FDP-JOBS") serves as New Jersey's education, employment and job training program under 42 U.S.C. § 681. *See* N.J.S.A. 44:10–19.

To assist recipients in pursuing their educational and vocational goals, the FDP provides such specific benefits as financial assistance for attendance at college (N.J.S.A. 44:10–25(f)), day care services (N.J.S.A. 44:25(g)(1)), transportation to job or school (N.J.S.A. 44:10–25(g)(2)), and the extension of Medicaid benefits for up to two years for persons who are able to "graduate" from the AFDC program as a result of their obtaining gainful employment (N.J.S.A. 44:10–25(g)(3)).

■ In addition, and of central import to this action, is another FDP provision which defendants have dubbed the "Family Cap," an amendment to existing state law that eliminates the standard AFDC grant increase (*e.g.*, $102 for a second child and $64 for a third child) for any child conceived by and born to an AFDC recipient. The intent behind this cap on family benefits is to enhance family structure while simultaneously fostering responsibility and self-sufficiency. Indeed, the New Jersey legislature declared

in its policy statement regarding its alteration of the AFDC benefits schedule that:

> [t]he welfare system in this State should be designed to promote family stability among AFDC recipients by eliminating the incentive to break up families created by AFDC regulations, which undermines the ability of AFDC-enrolled mothers to achieve economic self-sufficiency and thereby perpetuates their dependence, and that of their children, on welfare.

N.J.S.A. 44:10–3.7(c).

This policy statement accompanied the enactment of the Family Cap provision, which is the only component of the FDP challenged in this case. Briefly stated, after an initial ten-month grace period to provide notice to affected recipients, the FDP denies additional benefits to families receiving AFDC upon the birth of an additional child conceived while the family is receiving AFDC. A family affected by this provision is entitled to retain a larger amount of earned income, purportedly permitting the family not only to offset the denial of additional benefits but to realize an overall increase in financial benefits through earnings. *See* N.J.S.A. 44:10–3.5 and –3.6.[2] For example, a parent with one child can receive a grant up to $322 a month in New Jersey. Under the federal system, if

---

2. The full text of provisions is as follows:

N.J.S.A. 44:10–3.5:
The Commissioner of Human Services shall revise the schedule of benefits to be paid to a recipient family under the program of aid to families with dependent children (AFDC) established pursuant to P.L.1959, c. 86 (C. 44:10–1 et seq.), by eliminating the increment in benefits under the program for which that family would otherwise be eligible as a result of the birth of a child during the period in which the family is eligible for AFDC benefits, or during a temporary period in which the family or adult recipient is ineligible for AFDC benefits pursuant to a penalty imposed by the commissioner for failure to comply with benefit eligibility requirements, subsequent to which the family or adult recipient is again eligible for benefits. The commissioner shall provide instead that a recipient family in which the adult recipient parents an additional child during the adult recipient's period of eligibility for AFDC benefits, or during a temporary penalty period of ineligibility for benefits, may receive additional benefits only pursuant to section 2 of this act [N.J.S.A. 44:10–3.6],

except in the case of a general increase in the amount of AFDC benefits which is provided to all program recipients.
N.J.S.A. 44:10–3.6:
In the case of an AFDC recipient family in which the adult recipient parents an additional child during the period in which the family is eligible for AFDC benefits, or during a temporary penalty period of ineligibility for benefits subsequent to which the family or adult recipient again becomes eligible for benefits, the Commissioner of Human Services, subject to federal approval, shall provide that in computing the amount of financial assistance which is eligible for federal reimbursement to be granted to that family, the following shall be deducted from the monthly earned income of each employed person in the family:
 a. those earned income disregards provided for under federal laws as set forth at N.J.A.C. 10:82–4.4; and
 b. an additional amount earned by each employed person which, at a maximum, is equal to the difference between the amount of subsection a. of this section and 50% of the monthly payment of financial assistance, adjusted for family size.

the mother had an additional child her grant would increase to $424 a month. Under FDP, she will not receive this $102 increase. Similarly, a mother with two children would not receive the $64 increase in her grant that she would otherwise receive if she had a third child. Rec. 169.[3]

This Family Cap element of the FDP directly conflicts with existing federal law. Even though the FDP was enacted as a permanent, statewide change to New Jersey's AFDC program, its implementation could not occur without the state losing its federal matching funds, absent a waiver from the Secretary of HHS. Consequently, following the above enactments, the New Jersey Commissioner of Human Services determined to apply to HHS pursuant to § 1315(a) for waivers of those conflicting provisions of the federal act.

An examination of the administrative record submitted to this Court by the federal defendants in conjunction with these cross-motions reveals that much dialogue and exchange of views on this admittedly sensitive issue transpired before the state's formal application was even filed. For instance, the record indicates that in mid-May 1992, HHS Assistant Secretary for Children and Families Jo Anne B. Barnhart met with a broad coalition of welfare advocacy groups to receive their commentary on and objections to New Jersey's proposed waiver application. Rec. 25, 27. Following this meeting, on May 19, 1992 Melville D. Miller, President of Legal Services of New Jersey, Inc. (one of the plaintiffs' current counsel of record), submitted on behalf of his organization and twelve other advocacy groups a lengthy memorandum to Assistant Secretary Barnhart detailing certain preliminary objections to New Jersey's AFDC waiver request. Rec. 27–52.

Subsequently, on June 5, 1992, DHS submitted its formal application to HHS for a waiver under § 1315(a) authorizing, *inter alia*, the implementation of the FDP–JOBS program and the Family Cap provision as a five-year experimental project. Rec. 159. The application was buttressed by a lengthy proposal describing the counterproductive re-sults wrought by current welfare policies and then enumerating the manner in which New Jersey's FDP would address these deficiencies with the goal of ultimately breaking the cycle of poverty which has ensnared so many welfare recipients. Rec. 160–273. While DHS conceded that depriving children of AFDC might seem "harsh," it nevertheless justified the Family Cap provision by stating that its purpose is to encourage parents to be responsible in their decision to have another child while receiving welfare. Rec. 168–70. Indeed, DHS went so far as to describe the choice to have a child while one is still receiving the fruit of the taxpayers' labor "irresponsible [and] not socially desirable." Rec. 168. DHS stated that it would offer financial incentives to encourage AFDC parents with children born after the Family Cap became effective to offset the benefit they would otherwise have received through priority for employment and training services in FDP–JOBS and through the increase in the earnings disregard. Rec. 169–70.

On July 2, 1992 Assistant Secretary Barnhart submitted a memorandum to then-Secretary Louis Sullivan, formally recommending approval of New Jersey's waiver request. Rec. 24. Shortly thereafter, on July 9, 1992 the aforementioned advocacy groups delivered to Assistant Secretary Barnhart a letter to supplement their earlier submission and which was predicated upon their "review of the final application submitted by the State, together with [their] review of the implementing regulations for the FDP as published in the New Jersey Register ..." Rec. 20. In a reply letter dated August 7, 1992, Assistant Secretary Barnhart informed Legal Services of New Jersey that their supplemental objections were considered by HHS but that waiver was still granted, in part because the New Jersey program "represented a new and innovative approach aimed at promoting self-sufficiency and reducing long-term welfare dependency." Rec. 1.

On July 20, 1992 Secretary Sullivan approved the waiver to allow the entire FDP to be implemented as a five-year research experiment under § 1315(a). Rec. 2–19. The

---

**3.** "Rec. ——" denotes page references to the administrative record submitted by the federal defendants and certified by HHS Assistant Secretary for Children and Families Mary Jo Bane.

waiver allowed DHS to implement the Family Cap statewide commencing on October 1, 1992. Rec. 5. Included among the various Terms and Conditions of the waiver was the requirement that New Jersey conduct a demonstration project whereby families subject to the provisions of the FDP were "randomly assigned to either a treatment group whose eligibility will be determined based on FDP provisions, or to a nontreatment group for whom eligibility will be determined based on existing program provisions." Rec. 5. DHS was permitted to phase-in FDP–JOBS, first in Essex, Hudson and Camden counties and then in the remaining eighteen counties according to a DHS-sponsored schedule, but "by no later than June 1995." Rec. 6. DHS adopted regulations to implement the FDP on September 21, 1992. 24 N.J.Reg. 3352 (September 21, 1992). The regulations became operative on October 1, 1992, and provide that every child born after August 1, 1993 to a parent receiving AFDC for any month within the ten months preceding the birth of the child "shall be excluded from the eligible unit" and the parent "shall not be entitled to incrementally increased AFDC benefits as a result of the birth of a child(ren)." N.J.A.C. 10:82–1.11(a). The only exception is for the children of new AFDC applicants born within ten months of their families' application for benefits. N.J.A.C. 10:82–1.11(a)2.

## II. DISCUSSION

Under Fed.R.Civ.P. 56, summary judgment may only be granted if, drawing all inferences in favor of the nonmoving party, there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3rd Cir.1987). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, for which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of

identifying evidence which demonstrates the absence of a genuine issue of material fact. *Id.* at 322–23, 106 S.Ct. at 2552. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue of trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(e). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56. Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of material facts.

### A. The Secretary's Approval of Waivers for New Jersey's Family Development Program did not Violate the Administrative Procedure Act

#### 1. Judicial Review

As a threshold issue, this Court must address the Secretary's contention that her approval of AFDC demonstration projects such as the one in controversy here under § 1115 of the Social Security Act (42 U.S.C. § 1315(a)) is committed to agency discretion by law.[4] Under § 1315(a), the Secretary may waive a state's compliance with controlling federal laws where:

> [i]n the case of any experimental, pilot, or demonstration project which, *in the judgment of the Secretary, is likely to assist in promoting the objectives of . . .* Part A or D of subchapter IV of this chapter, in a State or States—

> (1) the Secretary may waive compliance with any of the requirements of section . . . 1396a of this title, as the case may be, *to the extent and for the period he [or she] finds necessary* to enable such State or States to carry out such project . . .

4. References to the "Secretary" in this Opinion are to the current Secretary, as convention provides. However, all material decisions with respect to the HHS waiver were made by her predecessor.

42 U.S.C. § 1315(a) (emphasis supplied). Plaintiffs assert that the waiver permitting New Jersey to implement the FDP with its Family Cap provision runs afoul of § 1315(a) and hence must be invalidated under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* The Secretary argues in opposition that her waiver was neither arbitrary nor capricious in contravention of the APA, and further contends that her decision to grant said waiver is not amenable to judicial review.

■ The APA affords judicial review of agency actions to "person[s] suffering legal wrong because of agency action." 5 U.S.C. § 702. Indeed, there is embodied within the APA a "'basic presumption of judicial review.'" *Lincoln v. Vigil,* — U.S. —, —, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)). *See also Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986) (noting "the strong presumption that Congress intends judicial review of administrative action"). "Only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs.,* 387 U.S. at 141, 87 S.Ct. at 1511.

However, notwithstanding the great favor in which judicial review is held, the APA provides certain statutory exceptions to the general reviewability doctrine. Section 701(a) of the APA provides that:

(a) This chapter applies, according to the provisions thereof, except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

5 U.S.C. § 701(a). The Secretary presently argues that the subjective language of § 1315(a) deferring to her judgment and her findings, as opposed to more objective, empirical criteria, evinces the APA's inapplicability to her discretionary decision to grant a waiver.

It is axiomatic that absent an explicit statutory bar, judicial review of agency action is available except "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply,'" *Webster v. Doe,* 486 U.S. 592, 599, 108 S.Ct. 2047, 2051, 100 L.Ed.2d 632 (1988) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820–21, 28 L.Ed.2d 136 (1971)), thereby denying "a court [a] meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985). "Thus, in order to find that an agency action is not subject to judicial review, [a court] must find that there are no judicially manageable standards against which [the] court may judge whether an agency abused its discretion." *Chong v. Director, United States Information Agency,* 821 F.2d 171, 175 (3d Cir.1987).

The linchpin supporting the Secretary's present assertion of unreviewable discretion is the Supreme Court's decision of *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 in which the Court determined that unreviewable administrative discretion was authorized by a statute the Secretary finds "strikingly similar" to § 1315(a). In *Webster,* the plaintiff challenged his dismissal from the Central Intelligence Agency ("CIA"). The pertinent statute provided that the CIA Director "may, in his [or her] discretion, terminate the employment of any officer or employee of the Agency whenever he [or she] shall deem such termination necessary or advisable in the interests of the United States...." *Webster,* 486 U.S. at 594, 108 S.Ct. at 2049 (quoting 50 U.S.C. § 403(c)). The Court, in finding the Director's termination action unreviewable, stated that the statute "allows termination of an Agency employee whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States,' not simply when the dismissal *is* necessary or advisable to those interests." *Id.* at 600, 108 S.Ct. at 2052. The Court concluded that this standard "fairly exude[d]" deference to the agency head such that the application of any meaningful judicial standard of review was foreclosed. *Id.*

Thus, says the Secretary, § 1315(a), like the statute in *Webster,* grants unreviewable discretion to her to approve waivers for demonstration projects she deems likely to assist in promoting the AFDC goals; moreover, the breadth of an approved project is to be ascertained by the Secretary based upon what she believes to be necessary to carry out the project. "The statute does not include standards directing how the Secretary is to exercise her discretion apart from requiring her to exercise her considered judgment as to whether the proposed demonstration project will likely further the purposes of the AFDC program." Fed.Def.Br. at 13 (footnote omitted).

■ However, the Secretary's reliance on *Webster* is misplaced. Her "linguistic" argument appears predicated largely on the words "deem" and "determine" in the text and legislative history of § 1315(a). However, "the mere fact that a statute contains discretionary language does not make agency action unreviewable." *Beno v. Shalala,* 30 F.3d 1057, 1066 (9th Cir.1994) (citing *Esmeralda v. Dep't of Energy,* 925 F.2d 1216, 1218–19 (9th Cir.1991)). In addition, the Court finds that *Webster's* finding of agency unreviewability must be limited to the narrow category of agency decisions that implicate concerns of national security, "an area of executive action 'in which courts have long been hesitant to intrude.'" *Lincoln,* —— U.S. at ——, 113 S.Ct. at 2031, (quoting *Franklin v. Massachusetts,* 505 U.S. ——, ——, 112 S.Ct. 2767, 2785, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring)). Indeed, as Justice Stevens explained in *Franklin,* "the operations of a secret intelligence agency may provide an exception to the norm of reviewability" and that "the Court has limited the exception to judicial review ... to cases involving national security, such as *Webster....*" *Franklin,* 505 U.S. at ——–——, 112 S.Ct. at 2784–85 (Stevens, J., concurring). *See also Ward v. Skinner,* 943 F.2d 157, 160–61 (1st Cir.), *cert. denied,* 503 U.S. 959, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992). Consequently, the insulation from review accorded the CIA director who took action "in the interest of the United States" simply cannot be grafted onto the Secretary

of HHS with respect to her approval of a welfare demonstration project.

Furthermore, as plaintiffs point out, § 1315(a) furnishes a judicially manageable standard by which the Secretary's waiver can be evaluated. That statute does not afford the Secretary unfettered discretion. Rather, "[i]t allows waivers only for the period and extent necessary to implement experimental projects which are 'likely to assist in promoting the objectives' of the AFDC program," which, as noted *supra,* are set forth in some detail at 42 U.S.C. § 601. *Beno,* 30 F.3d at 1067. Thus, as the Ninth Circuit has found, the limitations of §§ 1315(a) and 601 provide meaningful standards which a court may employ to evaluate the decision of the Secretary. *Id.*

Finally, I note that § 1315(a) does not trigger the type of concerns normally present when courts decline to review agency action. This is not a case where an agency's employee termination implicates national security concerns (*Webster v. Doe, supra* ) nor is it a case where an agency has determined how to budget funds from a lump-sum appropriation with little Congressional guidance (*Lincoln v. Vigil, supra* ), nor is it a situation where the Food and Drug Administration has decided not to commence enforcement proceedings against a state for using particular drugs in executions (*Heckler v. Chaney, supra* ). Rather, in this case the Court is confronted with an AFDC program circumscribed by comprehensive regulations with no intimation from Congress that the Secretary's discretion is immune from judicial scrutiny. "[T]he granting of an exemption from statutory requirements is not an area of agency discretion traditionally unreviewable ... [and] it would be somewhat surprising were Congress to grant unreviewable discretion to the Secretary to exempt States from such an all-encompassing series of statutory requirements." *Beno v. Shalala,* 853 F.Supp. 1195, 1205 (E.D.Cal.1993), *rev'd on other grounds,* 30 F.3d 1057. Indeed, while the Secretary contends that § 1315(a) waivers are one of the rare instances where agency action has been committed to agency discretion by law, this flies in the face of each court which has previously addressed the

issue. *See, e.g., Beno v. Shalala,* 30 F.3d 1057 (9th Cir.1994); *Aguayo v. Richardson,* 473 F.2d 1090 (2d Cir.), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974); *Crane v. Mathews,* 417 F.Supp. 532, 539 (N.D.Ga.1976); *California Welfare Rights Org. v. Richardson,* 348 F.Supp. 491, 497 (N.D.Cal.1972). This Court, too, must reject her premise.

## 2. Arbitrary and Capricious

 Having found that the Secretary's actions in granting the § 1315(a) waivers are amenable to judicial review, this Court must next focus on plaintiffs' substantive claim that those waivers violated the APA. Section 706(2)(A) of the APA states that a court, when reviewing agency action, may overturn that action if it is found to be "arbitrary or capricious." It has been determined that this standard requires the reviewing court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824. An agency's decision may be arbitrary and capricious only where:

> the agency has relied on factors which Congress has not intended it to consider, *entirely failed* to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is *so implausible* that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n v. State Farm Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (emphasis supplied). The reviewing court may not substitute its wisdom for that of, in this instance, the Secretary. *See Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24. Indeed, in a case involving the Secretary's grant of a waiver pursuant to § 1315(a), the scope of review has been limited "to the question [of] whether the Secretary had a rational basis for determining that the programs were 'likely to assist in promoting the objectives'" of AFDC. *Aguayo v. Richardson,* 473 F.2d 1090, 1105 (2d Cir.), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974).

Plaintiffs assert that the Secretary acted in excess of her authority under § 1315(a) in authorizing the Family Cap provision which, in their view, is not likely to assist in promoting the objectives of the Social Security Act. In addition, plaintiffs contest the breadth of the waivers approved as being beyond the extent necessary to effect the demonstration project since, *inter alia,* (1) the waivers permitted application of the Family Cap on a statewide basis while permitting the FDP–JOBS program to be phased in across the state over a three-year period, and (2) the Family Cap/work-incentive program is imposed on all AFDC recipient families regardless of whether they include members who can take advantage of the incentives designed to offset the denial of an increase in cash benefits upon the birth of an additional child. The subtext underlying each of these contentions is the allegation that the Secretary did not articulate on the record a satisfactory explanation for her action.

 At the outset the Court notes that while plaintiffs do not, and indeed cannot, assert that the Secretary was required to make formal findings or hold formal hearings before granting the waivers, *see Overton Park,* 401 U.S. at 417, 91 S.Ct. at 824, the record must nonetheless enable this Court to evaluate the challenged action to ascertain whether the agency has at least considered all the relevant factors. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). However, the record need not be a trail emblazoned every few yards with signposts detailing every minute fact that went into the Secretary's decisional process. Rather, this Court must simply be satisfied that (1) the materials before the Secretary were sufficient for her to at least consider the pertinent issues, and that (2) there was no clear error of judgment on her part. *See Aguayo,* 473 F.2d at 1106. Indeed, as Judge Friendly of the Second Circuit has written in the § 1315(a) waiver context:

> the material furnished by the State in justifying the programs and applying for approval adequately covered the policy, budgetary and logistical essentials, and the statute—speaking in terms of an otherwise

unfettered "judgment"—does not require that, before the Secretary approves an experiment, every i must be dotted and every t crossed.

*Id.* at 1107 (internal footnote omitted). Thus, this Court must uphold the action of the Secretary, even if it is predicated on a record of "less than ideal clarity," as long as the general outline of her rationale is reasonably discernable. *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866–67 (citations omitted).

█ Proceeding, then, to the "arbitrary or capricious" inquiry, it is clear that the caprice of the waivers must be judged by the guidelines set out at § 1315(a), so that the Court need only consider whether the waiver for the demonstration project is "likely to assist in promoting the objectives" of AFDC and whether compliance was waived for a permissible period and to a permissible extent. As to the first factor, plaintiffs direct my attention to Title IV of the Social Security Act, which expressly provides that the purpose of the AFDC program is to "furnish financial assistance ... to needy dependent children and [their] parents or relatives ... to help maintain and strengthen family life...." 42 U.S.C. § 601. Indeed, the statute goes on to identify other objectives behind AFDC, including the encouraging of "self-support and personal independence," the promotion of "continuing parental care and protection" for underprivileged children, while accomplishing all this without breaking the state's bank. *Id.*

The Waiver Request submitted by the state of New Jersey delineates the three primary goals of its entire FDP, namely (1) breaking the cycle of poverty that seems to ensnare recipient families into intergenerational dependence upon taxpayer dollars, (2) enhancing the role of individual responsibility, and (3) strengthening and reuniting family units. Rec. 164. Despite plaintiffs' protestations to the contrary, even a cursory review reveals that these aspirations for welfare reform are in precise consonance, rather than conflict, with the purposes underpinning AFDC. As to the Family Cap provision of the FDP, the Waiver Request specifically declares that:

[o]ne important way the FDP will encourage decision making is to offer parents a choice when they have another child while receiving welfare. A parent will not receive an AFDC benefit increase to take into account an additional child.

\* \* \* \* \* \*

However, [the FDP] will offer a financial incentive for these parents to work which potentially will more than offset the benefit they would have otherwise received. This incentive will equal the current federal disregards plus the difference between the disregards and 50 percent of the monthly payment standard for financial assistance. These cases will also receive priority for employment and training services.

This may appear harsh, but it is based on the same principle that applies to everyone else in our society. If a person is working and has a baby, that person's salary is not automatically increased. Yet, that is essentially what we are required to do under [current] federal AFDC regulations. We believe that if a person is given a choice, that person will do what is best for the family which, in this case, is work. We can best help others by empowering them to help themselves. The children will continue to be eligible for Medicaid and increased food stamps.

Rec. 169–70.

The above statement regarding the benefits ceiling imposed upon AFDC recipients, along with the provision for the maintenance of Medicaid and food stamps benefits for the children, clearly evince that the state's goals are congruous with § 601's stated purpose of enabling "parents of relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection...." 42 U.S.C. § 601. It is equally patent, from my examination of the documents generated by HHS, that the Secretary reviewed the state's submission regarding its Family Cap element and judged it to be likely to promote at the very least the AFDC objective of parental self-sufficiency and autonomy. Indeed, the terms and conditions appended to the Secretary's waivers

include specific provisions for evaluation of the FDP to measure if and to what extent the Family Cap aids AFDC recipients in slaying their own personal welfare dragon. Accordingly, I find that the Secretary's judgment that the state's FDP is consistent with the objectives of AFDC was predicated on a consideration of the relevant factors and was not arbitrary or capricious.

 In addition, plaintiffs also challenge the breadth of the waivers granted as arbitrary and capricious. Under § 1315(a), the Secretary may grant a waiver only "to the extent necessary and for the period he [or she] finds necessary to enable [a] State . . . to carry out its project." Cognizant of this standard, plaintiffs take great umbrage with that aspect of the Secretary's waiver which permitted the application of the Family Cap on all AFDC families throughout New Jersey, except for 3,000 families randomly selected for a control group. The waiver directed DHS to gather data regarding the effect of the Family Cap from these 3,000 families and from 6,000 families placed into an experimental group. Rec. 5–8. Accordingly, the Secretary allowed the cap to go into effect on all but 9,000 of the approximately 143,000 families which comprise New Jersey's statewide AFDC population.

Plaintiffs claim that there was simply no need for the Secretary to allow the state to apply its demonstration project on recipients who are not part of the data-generating group. In support of their contention they rely heavily, if not exclusively, on the Ninth Circuit's recent decision in *Beno · v. Shalala,* wherein a divided panel found "wholly unjustified" the Secretary's approval of California's imposition of an experimental benefit reduction on virtually all of its AFDC recipients while only a small number of recipients were included in data collection groups. *Beno,* 30 F.3d at 1073. Plaintiffs state that in this case, as in *Beno,* it is unconscionable and, from a survey perspective, " 'methodologically indefensible' " to cap benefits to recipients who are not included in the study. *See id.* Why, queries the plaintiff class, should the state expose a large number of subjects to the Family Cap and yet study only a few?

However, as even the majority in *Beno* recognized, the reviewing court has no jurisdiction to review the wisdom of the state's undertaking, *id.;* as I have noted previously in my Opinion, the APA does not allow this Court to substitute its judgment for that of the Secretary when undertaking the deferential arbitrary and capricious inquiry. Perhaps in recognition of this, plaintiffs expend less energy on their substantive attack on the FDP and focus more on their assertion that the record as presently constituted does not enable this Court to ascertain whether the Secretary considered the broad range of issues pertaining to the extent of the project.

Plaintiffs' most vigorous assault centers on the Secretary's purported failure to address the specific objections raised by their representatives during the administrative review process. The class argues that this Court should remand this action to the Secretary for additional consideration of plaintiffs' objections in light of *Beno,* which found remand appropriate after determining that the record contained essentially no evidence whatsoever to indicate that the Secretary ever took note of plaintiffs' opposition, but for her one "conclusory" letter to their counsel. *Id.* at 1074. Apparently, the plaintiffs here glean from *Beno* a blanket rule that in all cases an administrative record is deficient and must be supplemented where it does not contain a specific recitation and refutation of objections submitted in opposition to a proposed § 1315(a) waiver.

However, a careful analysis of the *Beno* majority's finding that the Secretary failed to consider adequately plaintiffs' materials reveals that it is predicated largely on the fact that the Secretary's final waiver draft had been prepared on the *same day* that she received plaintiffs' objections. *Id.* at 1075. As the court stated, "[i]f anything, the timing of the waiver approval—HHS's final changes to the draft Terms were made on the very day it received plaintiffs' objections—suggests [that HHS did not consider those objections]." *Id.* Clearly, any meaningful study of the plaintiffs' concerns was inconceivable in *Beno* given that only a few hours elapsed between the submission of the objections and the preparation of the final waiver.

However, the instant case is readily distinguishable from *Beno,* as the concerns of temporal proximity so crucial in that decision are notably absent here. While the Ninth Circuit rejected the inference that the Secretary reviewed the plaintiffs' objections since her waiver was prepared the day those submissions were received, here the need for any *inference* of administrative consideration is entirely vitiated by the Secretary's explicit indication that plaintiffs' objections figured into her deliberative process. Rec. 1. While the *Beno* majority might discount such a statement on the grounds that " '[s]tating that a factor was considered ... is not a substitute for considering it,' " *id.* (citation omitted), in this case such a conclusion would run counter to common sense and experience. It is overwhelmingly clear that the Secretary gave more to plaintiffs' concerns than the quick glance that the *Beno* court found so troubling and inadequate. The record here reflects that HHS officials had at least one meeting with plaintiffs' representatives to address the latter's concern about the waiver request. Rec. 27. It also contains lengthy objections from a broad coalition of welfare-advocacy groups in opposition to the proposed waiver, as well as scores of letters submitted by the general public, mostly in opposition to New Jersey's reform proposal. Indeed, any assertion that the Secretary did not consider plaintiffs' views is particularly untenable given plaintiffs' letter to Assistant Secretary Barnhart, which went so far as to thank her for "taking the time to meet with us *concerning our objections* to the New Jersey waiver request" and which further expressed "admiration for the candor and understanding of the issues that [she] demonstrated during the meeting." Rec. 27 (emphasis supplied).

Thus, given the fact that prior to making her decision to grant the waiver the Secretary had before her extensive materials as to the purported harms the FDP might cause, this Court concludes that the Secretary considered those objections, but instead accepted the state's position and approved the waiver. In this case, as in *Aguayo,* the Secretary had sufficient data, including information and arguments addressing all the pertinent issues, to consider the factors relevant to her decision. *See also Beno,* 30 F.3d at 1077 (O'Scannlain, J., dissenting). It would therefore be absurd, if not the height of hubris, for plaintiffs to suggest that the Secretary ignored the materials presented in contravention of the state's position simply because she was not persuaded by them.

At bottom, plaintiffs' call for a remand and rearticulation is really an invitation for this Court to cast itself as a "super-Secretary" fleshing out in great detail the decisional process behind the waiver grant. This invitation, however, runs counter to the Supreme Court's admonition in *Motor Vehicle Mfr. Ass'n, supra,* to uphold an administrative decision if its basis can be sensibly determined. A finding of arbitrariness can issue only if the Secretary "entirely failed" to consider a problem or if the action is simply "so implausible." These words are clearly words of circumscription limiting reversal of agency decisions to the "rare case when [they are] *utterly unsupported* by the record." *Beno,* 30 F.3d at 1076 (O'Scannlain, J., dissenting) (emphasis supplied). The danger in exceeding these judicially engrafted boundaries and requiring a precise refutation of each objection lies in the enormous burden that would be imposed on the Secretary. For example, it would be preposterous to order the Secretary to provide a written response to the protests lodged by plaintiffs in their over 50 pages of critical submissions merely to prove that she considered them, when she has already so stated and when plaintiffs have already so acknowledged. Moreover, if plaintiffs' reasoning is taken to the extreme, it might well compel the Secretary in this case to respond to the scores of letters submitted by private citizens in opposition to the FDP, an onerous task which would ultimately detract from, rather than aid, any meaningful review.

Indeed, plaintiffs' proposed increase in the procedural and administrative hurdles of the waiver process would merely add another layer of bureaucracy whose only effect would be to prolong further the stranglehold of welfare dependency. I will not countenance the imposition of a longer and more onerous approval process that ultimately could dissuade states from even attempting innovative

welfare reform. In addition, the Court will not impose a burden upon the Secretary to expend her department's finite resources simply to dot every "i" and cross every "t" with respect to good-faith efforts at reform, especially when the nation is crying out for welfare alternatives which genuinely promote economic self-sufficiency.

Moreover, this Court is able reasonably to discern the path of the Secretary's decision from its examination of the record as it is presently constituted. Approval of that portion of the FDP that permitted statewide application of the Family Cap while allowing a three-year phase-in for the enhanced JOBS program is, first of all, well within the Secretary's discretion. Permitting the state to ascertain its administrative capacity to implement its JOBS program can hardly be deemed arbitrary, especially given the AFDC goal of aiding children in a manner "practicable under the conditions [of the] State." 42 U.S.C. § 601. As to the record itself, the waiver terms and conditions include a timetable for the phase-in of the JOBS program, Rec. 6–8, that mandates an immediate implementation of the enhanced FDP–JOBS in the three largest New Jersey counties where 60% of the state's AFDC recipients reside. Rec. 165. Furthermore, the Secretary granted the waivers needed to allow concurrent operation of New Jersey's existing JOBS program with the enhanced FDP program to ensure that those counties not yet under the enhanced program would continue to provide JOBS services to AFDC recipients. Rec. 7. In addition, the Secretary's decision to approve the FDP's statewide Family Cap/work incentive aspect is equally reflective of a rational decision to allow the state to implement a program directed toward encouraging AFDC recipients to take personal responsibility for the support of their additional children. It was therefore not an abuse of her discretion for the Secretary to allow New Jersey to execute this provision aimed at encouraging employment and treating AFDC families throughout the state equally with the working poor. *See, e.g., Dandridge v. Williams,* 397 U.S. 471, 486, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970).

Finally, plaintiffs object to the Secretary's decision not to waive § 402(a)(38) of the Social Security Act, 42 U.S.C. § 602(a)(38), as requested by the state. However, it appears that the Secretary did not waive § 602(a)(38) as that would remove the additional child from the AFDC family unit, which would have the effect of denying that child the automatic right to Medicaid coverage and other potential benefits associated with eligibility.

Accordingly, for each of the reasons stated above, I find that the Secretary's approval of waivers for New Jersey's FDP were likely to assist in promoting the objective(s) of AFDC and were not arbitrary and capricious such that there has been no violation of the APA.

### B. The Family Cap does not Violate the Human Subjects Protections of 42 U.S.C. § 3515b

42 U.S.C. § 3515b contains safeguards for human subjects in research projects or experiments conducted with funds appropriated to HHS. It provides in relevant part that no HHS appropriated funds:

> shall be used to pay for any research program or project or any program, project, or course which is of an experimental nature, or any other activity involving human participants, which is determined by the Secretary or a court of competent jurisdiction to present a danger to the physical, mental, or emotional well-being of a participant or subject of such program, project, or course, without the written, informed consent of each participant or subject, or a participant's parents or legal guardian, if such participant or subject is under eighteen years of age. The Secretary shall adopt appropriate regulations respecting this section.

42 U.S.C. § 3515b. Plaintiffs contend that the Family Cap presents a real and immediate danger to themselves and their dependent children given the ceiling that it places on AFDC funds they receive. They charge that the Secretary approved the Family Cap as an experiment without first determining whether it presented a danger to the recipients and their dependents and, consequently,

whether informed consent of each recipient was first required.

■ It is the position of the Secretary that HHS' present human subject regulations generally exempt welfare experiments from review by an Institutional Review Board ("IRB"). These regulations, located at 45 C.F.R. Part 46, require that HHS research on human subjects must provide (1) prior review of the project by an IRB, 45 C.F.R. §§ 46.107–.115, and (2) informed consent, 45 C.F.R. §§ 46.116–.124. Section 46.101(b)(5)(i) specifically excludes from these aforementioned safeguards research and demonstration projects designed for "public benefit or service programs," "procedures for obtaining benefits or services under those programs," "possible changes in or alternatives to those programs and procedures," and "possible changes in methods or levels of payment for benefits or services under those programs." Thus, these regulations provide that as a general rule a project which changes or alters benefits received will not present a danger such that the informed consent requirement is triggered, but they do not foreclose a finding of danger in a specific situation. *See Beno,* 853 F.Supp. at 1210 (citing 45 C.F.R. § 46.102(d)), *rev'd on other grounds,* 30 F.3d 1057.

The Secretary argues that § 3515b by its terms contemplates an estimation in advance of the danger(s) posed by a particular experimental project. Comments published with regulations promulgated in 1983 justify the general exemption for social welfare research as undertakings "fundamentally different" from the experiments otherwise within the ambit of the statute. 48 Fed.Reg. 9266 (1983). While conventional biomedical or behavioral research poses risks of "significant physical invasions or intrusions on the privacy of participants" and implicate the knowledge and experience of an IRB, benefit programs characteristically involve "alterations in eligibility criteria, benefit levels or delivery systems" which are peculiarly within the purview of government (especially state government) officials. *Id.* at 9268. Moreover, the comments express the notion that benefit programs are already subjected to substantial state and federal review such that requir-

ing an "additional layer of review for such projects [would be] duplicative and needlessly burdensome ·in light of the substantial review process to which they are already subjected by state and federal officials." *Id.* at 9266.

■ Thus, it is clear that the Secretary's considered judgment that AFDC demonstration projects involving changes in benefit levels need no additional review represents a reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. *Clarke v. Securities Indus. Assn.,* 479 U.S. 388, 403–04, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987) (citations omitted). *See also Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("the question for the court is whether the agency's answer is based on a permissible construction of the statute"). New Jersey's change in how it allocates AFDC benefits is exactly the kind of "changes in . . . levels of payment" addressed by the general exemption from review under § 46.101(b)(5)(i). Accordingly, it is clear that the Family Cap provision in this action falls within that category of social programs insulated from additional review such that the Secretary's failure to comport with the dictates of § 3515b is not actionable. Having so determined that HHS has by regulation exempted the Family Cap from the statutory requirement of review by an IRB, it stands to reason that that portion of § 3515b which requires the Secretary to obtain the written consent of each participant in a human experimentation claim is·simply not implicated.

## C. The Family Cap Provision does not Violate the Social Security Act

Plaintiffs contend that the Family Cap "patently conflicts" with numerous provisions of the Social Security Act and implementing regulations that either were not waived or could not have been waived by HHS. I address each contention *seriatim.*

### 1. Assistance to All Eligible Individuals

Section 402 of the Social Security Act requires that a state AFDC plan must:

provide that all individuals wishing to make application for aid to families with dependent children shall have the opportunity to do so, and that aid to families with dependent children shall ... be furnished with reasonable promptness *to all eligible individuals ....*

42 U.S.C. § 602(a)(10()A) (emphasis supplied). Plaintiffs argue that since the Family Cap is a state law that denies AFDC benefits to individual children who are eligible for AFDC under federal standards, it violates § 602(a)(10)(A).

■ However, in claiming that New Jersey's cap runs afoul of the statute, plaintiffs disregard one of the central tenets of the AFDC program, namely that "eligibility under the AFDC program has historically been premised upon the *household* as the basic unit of assistance." *Deel v. Jackson,* 862 F.2d 1079, 1085 (4th Cir.) (in banc), *cert. denied,* 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 991 (1989) (emphasis supplied). Where a household is receiving AFDC, all of the individuals within that household are receiving it. As has been stated, "payments to one individual in a family are 'generally beneficial to the entire family unit.'" *Bradley v. Austin,* 841 F.2d 1288, 1296 (6th Cir.1988) (quoting *Bowen v. Gilliard,* 483 U.S. 587, 599, 107 S.Ct. 3008, 3016, 97 L.Ed.2d 485 (1987)).

■ Thus, while plaintiffs have referred to the Family Cap as the "Child Exclusion" throughout their papers, this appellation is inaccurate. Under New Jersey's program, no child is excluded from benefits; rather, the additional child born to the AFDC recipient household simply partakes of the assistance already received by that household at the same monetary level. Thus, the Family Cap here is analogous to the maximum family payment upheld (on both § 602(a)(10)(A) and equal protection grounds) by the Supreme Court in *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). At issue in *Dandridge* was Maryland's AFDC program which imposed a benefits ceiling of $240 to $250 on each household's monthly AFDC grant. The *Dandridge* plaintiffs argued that this maximum grant system violated § 602(a)(10) in that it

denied welfare assistance to the younger children of large families. *Dandridge,* 397 U.S. at 476, 90 S.Ct. at 1157.

In reviewing the provision, the Court conceded that it had the effect of reducing the per capita benefits to the children in the largest families. However, the Court went on to discount plaintiffs' claim that younger children in these families were totally deprived of aid, noting that:

> ·a more realistic view is that the lot of the entire family is diminished because of the presence of additional children without any increase in payments. It is no more accurate to say that the last child's grant is wholly taken away than to say that the grant of the first child is totally rescinded. In fact, it is the *family* grant that is affected.

*Id.* at 477–78, 90 S.Ct. at 1158 (citation omitted). Accordingly, after noting that a state has great latitude in dispensing its available funds, the Court determined that Maryland's program did not transgress the challenged statute "[s]o long as some aid is provided to all eligible families and all eligible children." *Id.* at 481, 90 S.Ct. at 1159. Moreover, as the Court found, Congress, in its 1967 Amendments to the Social Security Act, fully recognized that the Act permits maximum grant regulations. *Id.* at 482–83, 90 S.Ct. at 1160.

■ In the case at bar, the Family Cap, like the maximum benefits payment in *Dandridge,* imposes a benefits ceiling on the AFDC household. Any additional child born while that AFDC family is receiving payments will simply be included in the assistance unit and share in the benefits accorded the rest of the household. Here, as in *Dandridge,* while the level of cash assistance flowing to the household will not increase concomitantly with the birth of the additional child, it cannot be said that the additional child is denied benefits *in toto.* Moreover, the additional child is considered a member of the family assistance unit for all purposes other than the AFDC cash benefits increase, and is eligible as a family unit member to receive food stamps and Medicaid. Consequently, there is no violation of

§ 602(a)(10)(A)'s requirement to furnish aid to all eligible individuals.

## 2. Equitable Treatment Regulations

■ Plaintiffs further assert that the Family Cap violates the long-standing HHS principle that a state treat eligible individuals and groups of residents on an equitable basis. HHS regulations provide that "eligibility conditions" in a state plan "must not exclude individuals or groups on an arbitrary or unreasonable basis, and must not result in inequitable treatment of individuals or groups in light of the provisions and purposes of the public assistance titles of the Social Security Act." 45 C.F.R. § 233.10(a)(1). It is plaintiffs' position that the additional children born to AFDC recipients are denied benefits based solely on what the state has deemed the "irresponsible" behavior of their parents. However, as noted above, the Family Cap does not operate to deny any child benefits, but instead simply requires that child to share in the cash payments allotted to his or her particular AFDC household.

Plaintiffs also assert that while states are free to set their own standard of need, their "determination of need and amount of assistance for all applicants and recipients [must] be made on an objective and equitable basis." 45 C.F.R. § 233.20(a)(1). They claim that the cap violates this regulation since it affords different levels of cash assistance to families of identical size and need based upon a parent's decision to have a child while in receipt of AFDC. The Court, however, perceives no violation here. The cap applies equally to all AFDC recipients who decide to conceive and give birth to another child since it went into effect. The fact that there may be different levels of assistance given to families of equal size is potentially offset by the additional earned income disregards available to the affected families. Accordingly, the cap does not violate any of HHS' regulations regarding equitable treatment of aid recipients.

## 3. Work–Related Programs

Pursuant to 42 U.S.C. §§ 681–687, states participating in the AFDC program must establish and operate a "job opportunities and basic skills program," or JOBS. The services and activities of JOBS includes educational activities, job skills training, job readiness activities to help prepare participants for work, job development and job placement, job searches, on-the-job training, work supplementation programs, and community work experience. § 682(d)(1)(A)(i). In addition, a state may also offer post-secondary education in appropriate cases as well as such other education, training and employment as it may deem necessary. § 682(d)(1)(B).

Section 684, the fulcrum upon which plaintiffs' instant claim is balanced, by its express terms applies "to any work-related programs and activities under this part, and under any other work-related programs and activities authorized (in connection with the AFDC program) under section 1315 of this title." § 684(e). Section 684(a) requires that a state must, "[i]n assigning participants in the program ... to any program activity," ensure that each assignment takes into account "the physical capacity, skills, experience, health and safety, family responsibilities, and place of residence of the participant." § 684(a)(1). In addition, the state must make certain that no participant will be required to travel unreasonably to partake in the program activity, that no invidious discrimination occurs with respect to assignments, that the conditions of participation are reasonable, and that each assignment is based on available resources, the participant's circumstances and local employment opportunities. § 684(a)(2)–(5).

Plaintiffs contend that the Family Cap, as it operates in conjunction with the FDP–JOBS program, is subject to the requirement in § 684(a)(4) that the conditions of participation be reasonable, "taking into account in each case the proficiency of the participant and the child care and other supportive services needs of the participant." § 684(a)(4). Their discontent arises from the fact that, "[s]imply put, parents must either go to work or participate in FDP–JOBS to obtain the education or training services needed to secure a job if they are to make up for the substantial reductions in AFDC triggered by the Exclusion." Pl.Br. at 44.

However, this Court cannot discern any inherently sacrosanct status accorded to welfare recipients which somehow insulates them from the obligation to don a blue collar, a white collar or even a black robe in order to earn their daily bread—an obligation that is regularly imposed on the rest of us. Notwithstanding this, in turning to the more arid issue of statutory review, the Court finds that a reading of § 684 unquestionably establishes that the provision is intended to regulate job placement programs—but not changes in benefit levels or work incentives based upon the relaxation of earned income limits. "A benefit cut, no matter what its purpose, is not a 'program' or 'activity' offered by the State to assure that needy families obtain education, training and employment." *Beno*, 853 F.Supp. at 1215. Consequently, plaintiffs' challenge under this provision must be discounted.

#### 4. Family Planning Service

Plaintiffs claim that the Family Cap is a "family planning service" subject to § 402(a)(15) of the Social Security Act, 42 U.S.C. § 602(a)(15), which requires a state AFDC plan to offer a voluntary plan "for preventing or reducing the incidence of births out of wedlock and otherwise strengthening family life." The cap, argue the plaintiffs, is a compulsory family planning service since it seeks to deter pregnancy in all women who receive AFDC. The Court does not agree. Section 602(a)(15), by its terms, is directed at requiring a state to provide birth control services to those AFDC recipients who seek them. The Family Cap, by *its* terms, however, addresses the problem of births out of wedlock by adjusting benefit levels; while some AFDC recipients may avail themselves of family planning services provided under § 602(a)(15) given the imposition of the cap, the cap itself cannot be construed as one of those services.

#### D. The Family Cap does not Violate Protections Addressing Research Involving Pregnant Women and Fetuses

Plaintiffs further argue that the Family Cap aspect of the FDP constitutes experimentation involving pregnant women and fetuses in contravention of HHS regulations setting forth additional protections for research, development and other activities involving pregnant women and their fetuses as well as *in vitro* fertilization. 45 C.F.R. § 46.201 *et seq.* However, the Family Cap has no effect on the level of benefits received by a pregnant woman; moreover, the data to be garnered from the program and evaluated by HHS/DHS does not at all implicate issues and/or concerns regarding pregnant women and/or fetuses. In other words, the Family Cap, and indeed the entire FDP, is not directed toward nor will it measure the effects on the pregnant or the unborn.

#### E. The Family Cap does not Violate the Due Process or Equal Protection Clauses of the Constitution

Plaintiffs have conceded that their challenge to the FDP is predicated mainly on the administrative and statutory arguments detailed above. Their primary goal, as stated at oral argument, is to secure a remand and reconsideration of their opposition to New Jersey's welfare reforms. However, plaintiffs also attempt to hold the Family Cap against the constitutional touchstones that are the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments (as well as Article I of the New Jersey Constitution), and it is to this final inquiry that the Court now turns.

Plaintiffs contend that the Family Cap trammels impermissibly upon their rights to due process and equal protection of the laws. They argue that the cap is irrational because it penalizes children for the behavior of their parents. In addition, plaintiffs assert that the cap fails the heightened strict scrutiny review since what it deems the state's "overriding" purpose in enacting the cap—deterring childbirth by welfare recipients—is an illegitimate goal sought to be realized by broad and overly intrusive means.

The Supreme Court has held that a program which places a ceiling on welfare benefits will pass constitutional muster provided that it bears a rational relationship to a legitimate state interest. *Dandridge*, 397 U.S. at 485–87, 90 S.Ct. at 1161–62. Plain-

tiffs argue that the Family Cap cannot meet this standard because in their view it "penalizes vulnerable and needy children for their parents' behavior over which they have no control: the circumstances of their conception and birth." Pl.Br. at 49. In support of this position they cite to, *inter alia, Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), where the Court deemed unconstitutional a Texas statute which withheld from local school districts funding for the education of children not legally admitted into this nation. While the Court realized that undocumented status is a proper subject for legislative action, it found it "difficult to conceive of a rational justification for penalizing these children for their presence in the United States." *Plyler*, 457 U.S. at 220, 102 S.Ct. at 2396. It therefore overturned the law, holding that "[e]ven if the State found it expedient to control the conduct of adults by acting against their children, legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." *Id.* *See also Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (holding unconstitutional a provision of the Social Security Act which allowed an illegitimate child to obtain benefits if a disabled parent either contributed to the child's support or lived with the child prior to the disability); *New Jersey Welfare Rights Organization v. Cahill*, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973) *(per curiam )* (finding statute limiting benefits to families in which parents are "ceremonially married" to deny equal protection to illegitimate children); *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (finding that a state may not create a right of action in favor of children for the wrongful death of a parent and exclude illegitimate children from the benefit of the same right).

However, reliance on the aforementioned decisions is unavailing here because the Family Cap is not an example of a state's attempt to influence the behavior of men and women by imposing sanctions on the children born of their illegitimate relationships. The legislation here does not direct the onus of parental conduct against the child, nor does it completely deprive children of benefits which they might otherwise receive but for the conduct of their parents. Rather, New Jersey's cap merely imposes a ceiling on the benefits accorded an AFDC household while permitting any additional child to share in that "capped" family income. Accordingly, this case is simply not within the ambit of *Plyler* and its forefathers, which found "behavior-modification" statutes that penalized children to be irrational.

 This Court's application of the rational basis test must be guided by the Supreme Court's pronouncement in *Jefferson v. Hackney*, 406 U.S. 535, 546–47, 92 S.Ct. 1724, 1731–32, 32 L.Ed.2d 285 (1972) which held that:

> [s]o long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them.

*See also Dandridge*, 397 U.S. at 487, 90 S.Ct. at 1162–63 ("the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients") (citations omitted). As noted above, New Jersey's welfare cap must be rationally related to a legitimate governmental purpose. The state (and indeed, the societal) interest served by the Family Cap has been well chronicled in the record as well as in this Opinion: to give AFDC recipients the same structure of incentives as working people, to promote individual responsibility, and to strengthen and stabilize the family unit. *See* N.J.S.A. 44:10–3.7; 24 N.J.Reg. 2155 (June 15, 1992).

These interests are clearly legitimate. Placing welfare households on a par with working families is a reasonable and appropriate goal of welfare reform; indeed, as the Supreme Court found in *Dandridge*, a "solid foundation for [a] regulation can be found in the State's legitimate interest in encouraging employment and avoiding discrimination between welfare families and the families of the

working poor." *Dandridge,* 397 U.S. at 486, 90 S.Ct. at 1162. The Family Cap, by maintaining the level of AFDC benefits despite the arrival of an additional child, puts the welfare household in the same situation as that of a working family, which does not automatically receive a wage increase every time it produces another child. This in turn reflects the reasoned legislative determination that a ceiling on benefits provides an incentive for parents to leave the welfare rolls for the work force, as any "advantage" of welfare in the form of the per child benefit increase is no longer available. This legislatively-inspired impetus to enter or return to employment further illustrates a rational decision by the state not only to encourage personal responsibility but also to assist AFDC beneficiaries in achieving self-sufficiency. In addition, it cannot be gainsaid that the Family Cap sends a message that recipients should consider the static level of their welfare benefits before having another child, a message that may reasonably have an ameliorative effect on the rate of out-of-wedlock births that only foster the familial instability and crushing cycle of poverty currently plaguing the welfare class.

Clearly there may be other means or methods that the legislature might have employed in seeking to implement changes in welfare benefits and welfare behavior. However, my inquiry does not address the outer limits of what might have been proposed, but rather is confined to reviewing what was in fact done. It is obvious that in this case, the state's interest in reforming welfare is legitimate. Indeed, as the Second Circuit noted in *Aguayo,* "[a] purpose to determine whether and how improvements can be made in the welfare system is as 'legitimate' or 'appropriate' as anything can be." *Aguayo,* 473 F.2d at 1109. It is equally plain from the foregoing discussion that New Jersey has sought to realize its reform goals in a reasonable and rational fashion. Consequently, I must dismiss plaintiffs' contention that the cap does not have a rational relationship to an appropriate state purpose.

Apparently recognizing the obstacles to their challenge to the rationality of the Family Cap, plaintiffs assert that the cap violates their fundamental right to make private procreative choices such that strict scrutiny review must be applied. They argue that the cap cannot meet this increased level of review because the state has no compelling interest in deterring child birth and because the cap is not narrowly tailored to meet this goal. Plaintiffs' claim, distilled to its essence, is that the Family Cap is a governmental attempt to alter recipients' reproductive behavior by denying them benefits should they make procreative decisions disfavored by the state.

■■■■ It is well-settled that decisions about family composition, conception and childbirth fall into a constitutionally protected zone of privacy. An individual has the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird,* 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972). Although the right to an abortion, for example, is not absolute and unfettered, the government may not actively interfere with the individual's exercise of that right by placing an undue burden on that individual's access to abortion services. *Planned Parenthood v. Casey,* — U.S. —, —, 112 S.Ct. 2791, 2820, 120 L.Ed.2d 674 (1992). Thus, while a state may not hinder one's exercise of protected choices, it is not obligated to remove obstacles that it did not create, including a lack of financial resources. *Rust v. Sullivan,* 500 U.S. 173, 201, 111 S.Ct. 1759, 1776–77, 114 L.Ed.2d 233 (1991); *Harris v. McRae,* 448 U.S. 297, 317, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980). In addition, once the government decides to provide public benefits, it may not selectively deny those benefits in order to infringe a constitutional right, including the right to procreative choice free from government influence. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972).

■■■ This case, however, does not present a situation where New Jersey has unduly burdened the procreative choice of the plaintiff class, as the Family Cap in no way conditions receipt of benefits upon plaintiffs' reproductive choices. Although plaintiffs may

claim that the state's failure to subsidize a recipient's choice to procreate intrudes upon that individual's reproductive freedom, this assertion misses the mark. An AFDC household is still entitled to and will still receive benefits whether or not a member of that household conceives and/or gives birth to an additional child. While benefits heretofore granted a recipient household to which another child is added will no longer be available, that family will not suffer any decrease in aid and in fact will continue receiving benefits at the same level as before. In other words, New Jersey's legislative action does nothing to bar an AFDC recipient from conceiving and/or bringing to term an additional child, but has merely removed the automatic benefit increase associated with an additional child under the federal program. Moreover, it should be noted that if New Jersey eliminated its AFDC program altogether, plaintiffs would be faced with the same choices concerning conception but with an even greater lack of financial resources.

Thus, while this Court recognizes that a woman has a right to be free from governmental intrusion vis-a-vis her procreative choices, "it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." *Harris,* 448 U.S. at 316, 100 S.Ct. at 2687–88. *See also Rust v. Sullivan,* 500 U.S. 173, 201, 111 S.Ct. 1759, 1776–77, 114 L.Ed.2d 233 (1991) ("the Government has no constitutional duty to subsidize an activity merely because it is constitutionally protected"). Accordingly, the Court finds that the Family Cap does not infringe plaintiffs' procreative rights. In addition, the Court finds that New Jersey's welfare reform efforts are rationally related to the legitimate state interests of altering the cycle of welfare dependency that it has determined AFDC engenders in its recipients as well as promoting individual responsibility and family stability.

## III. CONCLUSION

As the foregoing demonstrates, the Secretary's action in approving New Jersey's new welfare reform was neither arbitrary nor capricious, as her decisions at every level of the process manifest her consideration of the relevant issues while evincing no clear errors of judgment. Her grant of waivers to the state reflect her rational determination that the New Jersey plan was likely to promote the objectives of the AFDC program. Furthermore, the Family Cap provision of the FDP does not violate any statutory or constitutional mandate.

In conclusion, the Court notes that New Jersey's reform proposal does not attempt to fetter or constrain the welfare mother's right to bear as many children as she chooses, but simply requires her to find a way to pay for her progeny's care. This is not discrimination; rather, this is the reality known to so many working families who provide for their children without any expectation of outside assistance. The legislative choices made by the New Jersey Legislature and approved by the Secretary reflect their judgment that the exercise of fundamental rights by welfare recipients ofttimes brings with it the onset of fundamental responsibilities which the recipients themselves must bear. It cannot be said in arriving at this determination that either authority transgressed the permissible bounds of legislative action.

Accordingly, defendants' motion for the entry of summary judgment dismissing plaintiffs' Complaint is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE.** Plaintiffs' motion for summary judgment is **DENIED.** An appropriate Order shall issue with this Opinion.

### *ORDER*

This matter having come before the Court on the cross-motions of plaintiffs and defendants for the entry of summary judgment, and the Court having heard oral argument and having considered the submissions of the parties and of *amici curiae,* and for the reasons appearing more particularly in the Opinion of this Court in the above-captioned matter dated May 4, 1995, and good cause having been shown,

**IT IS** on this 4th day of May, 1995 hereby

**ORDERED** and **ADJUDGED** that plaintiffs' motion for the entry of summary judg-

ment be and the same hereby is **DENIED**, and it is further

**ORDERED** and **ADJUDGED** that defendants' motion for the entry of summary judgment dismissing the Complaint be and the same hereby is **GRANTED,** and it is further

**ORDERED** and **ADJUDGED** that the Complaint be and the same hereby is **DISMISSED WITH PREJUDICE.**