794 A.2d 822 (2002)
350 N.J. Super. 152
SOJOURNER A., on her own behalf and as guardian ad litem for her infant Y.A.; and Angela B., on her own behalf and as guardian ad litem for her infant W.B., Plaintiffs-Appellants, and
Rosa C., on her own behalf and as guardian ad litem for her infant Y.C.; and Crystal D., on her own behalf and as guardian ad litem for her infant X.D., on behalf of themselves and all others similarly situated, Plaintiffs,
v.
The NEW JERSEY DEPARTMENT OF HUMAN SERVICES and William Waldman, Commissioner of the New Jersey Department of Human Services, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued March 6, 2002.
Decided April 5, 2002.
*824 Sherry Leiwant argued the cause for appellants (Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, attorneys; Lawrence S. Lustberg and Risa E. Kaufman, on the brief; John E. Salyer, American Civil Liberties Union of New Jersey Foundation, on the brief; Martha F. Davis, Sherry Leiwant, and Spenta Cama, Now Legal Defense and Education Fund, on the brief; and Lenora Lapidus, Women's Rights Project, American Civil Liberties Union, on the brief).
Dennis J. Conklin, Senior Deputy Attorney General, argued the cause for respondents; (David Samson, Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Mr. Conklin, on the brief).
Before Judges KING, WECKER and WINKELSTEIN.
*823 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Plaintiffs Sojourner A. and Angela B. appeal the trial court's summary judgment order in favor of the New Jersey Department of Human Services and its Commissioner, William Waldman (State), declaring constitutional the provision of the New Jersey welfare statute commonly referred to as the "family cap," N.J.S.A. 44:10-61, which bars additional cash benefits to a family unit on account of the birth of a child while the family unit is receiving welfare benefits. We find the legislative enactment does not substantially intrude upon a woman's right to bear children, and the statute is reasonably related to legitimate governmental objectives breaking the cycle of poverty, promoting responsibility and self-reliance, and decreasing welfare dependency and strengthening families. We affirm.

I
Sojourner A. and Angela B.[1] are fictitious names of women who, on September 5, 1997, brought a class action against the State, claiming the family cap violates poor women's rights to privacy and denies them and their children equal protection under the New Jersey Constitution. Plaintiffs *825 sought declaratory and injunctive relief and an award of cash benefits "to all children improperly denied benefits by application of N.J.S.A. 44:10-61 and N.J.A.C. 10:90-2.18." The application for preliminary injunctive relief was denied on October 28, 1997. On July 17, 2000, the Law Division certified the following class of plaintiffs:
[A]ll women who have conceived or will conceive a child while they or someone in their family received welfare benefits (or within a year of such receipt) under the former AFDC program or under the Work First program any time after October 1, 1992, and all children born to such women after August 1, 1993 who have been or will be subject to N.J.S.A. 44:10-61 and N.J.A.C. 10:90-2.18 or their predecessor statute and regulations, N.J.S.A. 44:10-3.5 and N.J.A.C. 10:81-3.8 and 10.81-1.11.
On appeal, plaintiffs contend that the family cap was enacted to influence poor women not to become pregnant, having the unconstitutional effect of coercing poor women's reproductive choices, thereby violating their right to privacy. Plaintiffs further argue that the right of children and their families to equal protection has been infringed upon because certain classes of poor children are denied benefits simply because they are born while their family is receiving welfare, while other equally poor children, who are already receiving welfare benefits, are not subject to the cap provision. In response to plaintiffs' arguments, the State submits that the family cap serves the legitimate governmental interests of promoting responsibility and self-reliance, and reducing welfare dependency, and neither penalizes the exercise of a woman's fundamental right to procreate nor discriminates on the basis of suspect classifications.
The parties cross-moved for summary judgment. On August 30, 2000, Judge Iuliani rendered an oral decision in which he stated:
[T]he State has demonstrated a legitimate and a substantial relationship between the statutory classification and the ends asserted. The interest here of the legislature, who represents all of us, in promoting self-sufficient citizens, diminishing the dependency upon welfare and creating [parity] between welfare recipients and working people ... greatly outweighs [the] slight imposition or mere burden on ... plaintiff's right to privacy.
By order of December 18, 2000 he granted the State's cross-motion for summary judgment and dismissed the complaint with prejudice.

II
A joint federal and state welfare program, known as Aid to Families with Dependent Children (AFDC), was established under Title IV-A of the Social Security Act, 42 U.S.C.A. §§ 601-603. See N.J.S.A. 44:10-1 to -8. Effective July 1, 1992, the New Jersey Legislature enacted the Family Development Plan (FDP), N.J.S.A. 44:10-19 to -33, N.J.S.A. 44:10-3.3 to -3.8, which included a provision known as the family cap. N.J.S.A. 44:10-3.5. This provision denied incremental benefits to children born into family units receiving welfare:
The Commissioner of Human Services shall revise the schedule of benefits to be paid to a recipient family under the program of aid to families with dependent children (AFDC) ... by eliminating the increment in benefits under the program for which that family would otherwise be eligible as a result of the birth of a child during the period in *826 which the family is eligible for AFDC benefits....
[N.J.S.A. 44:10-3.5 (repealed 1997).]
Because this provision violated the federal AFDC requirement that benefits increase with the birth of each child, New Jersey applied for a waiver of this federal requirement. The waiver request delineated three primary goals of the new provision: (1) breaking the cycle of poverty; (2) enhancing the role of individual responsibility; and (3) strengthening and reuniting families. See C.K. v. New Jersey Dep't of Health & Human Servs., 92 F.3d 171, 184 (3d Cir.1996) (C.K.II), affirming, sub nom, C.K. v. Shalala, 883 F.Supp. 991 (D.N.J.1995) (C.K.I) (upholding Secretary of Health and Human Services' decision to waive State's compliance with controlling federal law). The federal government approved the waiver on July 20, 1992. C.K.I, I, 883 F.Supp. at 1000.
In 1996, Congress enacted the Temporary Assistance to Needy Families (TANF) block grant program to replace AFDC. 42 U.S.C.A. §§ 601-608. In response to the new federal law, on March 24, 1997, the New Jersey Legislature passed the Work First New Jersey (WFNJ) Act, N.J.S.A. 44:10-55 to -70, as part of a comprehensive effort to reform the prior welfare system,[2] replacing the FDP as the basic assistance program for poor families in the State. The WFNJ Act aims to break the cycle of welfare and to encourage employment, individual responsibility and family stability. N.J.S.A. 44:10-56. To advance these goals many services are provided to recipients, including: employment; on-the-job training; job search and readiness assistance; community and alternative work experience; vocational educational training; remedial education; and general equivalency diploma (GED) preparatory classes. N.J.S.A. 44:10-57. To assist recipients in pursuing their educational and vocational goals, the program provides support services, such as day care services, transportation to job or school and the extension of Medicaid benefits for up to two years. N.J.S.A. 44:10-38.
Among the provisions of the WFNJ Act, the Legislature enacted a family cap provision that was nearly identical to the cap under AFDC:
The level of cash assistance benefits payable to an assistance unit with dependent children shall not increase as a result of the birth of a child during the period in which the assistance unit is eligible for benefits[.]
[N.J.S.A. 44:10-61a.]
Assistance unit is defined as:
[A] single person without dependent children; a couple without dependent children; dependent children only; or a person or couple with one or more dependent children who are legally or blood-related, or who is their legal guardian, and who live together as a household unit.
[N.J.S.A. 44:10-57.]
The cap on cash assistance does not apply "to an individual in an assistance unit with dependent children who give[s] birth to a child fewer than 10 months after applying for and receiving cash assistance benefits," N.J.S.A. 44:10-61e, nor does it apply where the birth of a child is the result of rape or incest, N.J.S.A. 44:10-61f. Apart from these limited exceptions, the family cap provision denies additional cash benefits to families receiving welfare upon *827 the birth of an additional child. N.J.A.C. 10:90-2.18(a); see C.K. II, 92 F.3d at 179.
Eligibility for cash benefits under the WFNJ Act and the amount an eligible family unit will receive are determined under a need and benefit schedule set forth in the New Jersey Department of Human Services regulations. N.J.A.C. 10:90-3.3. The amount of benefits an eligible family unit receives is determined according to its size. For each child, the family's grant increases by an incremental amount. N.J.A.C. 10:90-3.3 (Schedule II). For example, an eligible mother with one child can receive a grant up to $322 a month. Prior to the implementation of the family cap, if that same mother had an additional child her grant would increase by $102 to $424 a month. Under the WFNJ Act (and under the former AFDC program), she will not receive this increase. Similarly, an eligible mother with two children will not receive the $64 increase in her grant that she otherwise would have received upon the birth of a third child. Ibid.
Significantly, although cash benefits are capped under the WFNJ Act, other benefits including Medicaid and food stamps will continue to increase upon the birth of a child even though the family unit is not eligible for an additional cash benefit. N.J.S.A. 44:10-61b; N.J.A.C. 10:90-2.18. Moreover, a family unit "affected by the [family cap] provision is entitled to retain a larger amount of earned income, permitting the family not only to offset the denial of additional benefits but to realize an overall increase in financial benefits through earnings." C.K. II, 92 F.3d at 179 (citing N.J.S.A. 44:10-3.5 & 3.6).
Studies have been undertaken to investigate the effects of the welfare reform on an ongoing basis. See N.J.S.A. 44:10-41. The results have been mixed. According to a study by Mathematics Policy Research, Inc., since the WFNJ Act took effect it has "expanded child care assistance and other services designed to ease welfare recipient's transition to the workforce. During the first two years, ... in the context of a strong economy, New Jersey has experienced an unprecedented reduction in its welfare caseload, ... declin[ing] by almost 40 percent from July 1997 (the time the State fully implemented WFNJ) through August 1999." The report also reveals that welfare receipt has fallen steadily while employment has increased steadily among WFNJ clients. Approximately a year and a half after entering the WFNJ program, more than one in three recipients were off welfare and working, and a third were no longer in poverty.
Another study, by the Rutgers School of Social Work, which was primarily directed at FDP in general rather than at the family cap in particular, revealed that women do not move off welfare more quickly, stay off welfare longer, or earn more money when they leave welfare. Nor does FDP "significantly" improve employment prospects, employment stability, and earnings among program participants. Reduction of welfare benefits may lead to homelessness and malnutrition. Moreover, the study showed that the original FDP program did have a "statistically significant impact on birth, abortion and family planning decisions." It revealed that between October 1992 and the end of 1996, there were 1,429 more abortions and 14,057 fewer births among AFDC recipients than would have occurred in the absence of the FDP.
With regard to the family cap specifically, the researchers concluded that the program has "communicated a message of personal responsibility to welfare recipients," with many of the program's beneficiaries saying that the family cap "is a fair rule that promotes individual responsibility, *828 stresses the financial responsibility of giving birth and keeps the recipient's focus on job and career training." A substantial number of recipients reported that the family cap "discourages out-of-wedlock births, provides more incentives to get off welfare and causes postponement or avoidance of pregnancy." However, the family cap and two-year Medicaid extension were not "effective in reducing recipiency and moving welfare recipients from welfare and into employment." Yet, while "the immediate impact of the imposition of the family cap was to increase abortions[,] ... [there was] also ... evidence of a growth over time in the use of family planning services and contraception ... as well as a decline over time in birth rates...."
A Legal Services of New Jersey study on welfare reform drew no conclusions about the effects of the family cap specifically, but instead focused on the impact of the new welfare program in its entirety, finding that one-third of welfare recipients have their benefits reduced for not complying with program requirements. Of the respondents whose benefits were reduced, almost one-fifth reported a termination of benefits, and nearly eighty percent reported being unable to support themselves and their households financially after the reduction.

III
The standard of appellate review of a grant of a motion for summary judgment, is whether, viewing all of the competent evidential material presented to the trial judge in a light most favorable to the non-moving party, the evidence is so one-sided that a reasonable fact-finder must resolve the disputed issue of material fact in favor of the movant. Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995); R. 4:46-2. Thus, in considering whether the Law Division properly decided the summary judgment motion, we apply the same standard as the motion judge. Antheunisse v. Tiffany & Co., 229 N.J.Super. 399-402, 551 A.2d 1006 (App. Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Township of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995) (citations omitted).

IV
The primary issue to be resolved in this matterwhether the family cap violates a welfare recipient's right to privacy and denies the recipient equal protectionhas been resolved under the United States Constitution. See C.K. I, 883 F.Supp. 991; C.K. II, 92 F.3d 171. In C.K. I and C.K. II the District Court of New Jersey and the Third Circuit, respectively, held that the family cap provisions of the former AFDC Act did not violate the procreative privacy and equal protection guarantees of the United States Constitution. Although not dispositive to our decision, a review of the analysis under the Federal Constitution is instructive.
Under the equal protection clause of the Fourteenth Amendment to the United States Constitution, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the law," U.S. Const. amend. XIV, § 1, statutes which classify by suspect class or impinge upon a fundamental right are subject to strict scrutiny and will be sustained "only if they are suitably tailored to serve a compelling state interest." City of Cleburne, Texas v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985) (citations omitted). When the State attempts to regulate a fundamental right or *829 suspect class, it must establish that a compelling state interest supports the classification and that no less restrictive alternative is available. Barone v. Department of Human Servs., 107 N.J. 355, 364-65, 526 A.2d 1055 (1987); Greenberg v. Kimmelman, 99 N.J. 552, 564, 494 A.2d 294 (1985). If a fundamental right is only indirectly affected, however, the legislation is subject to less scrutiny. The "state interest `must serve important governmental objectives and must be substantially related to the achievement of those objectives.'" Ibid. (quoting Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397, 407 (1976)). The New Jersey Supreme Court has observed that when legislation affects a fundamental right, if the effect of the legislation is "indirect or insubstantial," the United States Supreme Court has applied "the rational basis test and upheld legislative classification." Ibid.
In C.K. I, the plaintiff class made the identical argument as do plaintiffs in this casethat the family cap is a governmental attempt to alter welfare recipients' reproductive behavior by denying them benefits. 883 F.Supp. at 1014. The C.K. I court held that the State had not unduly burdened the private procreative choice of the plaintiffs since the family cap "in no way conditions the receipt of benefits upon plaintiffs' reproductive choices." 883 F.Supp. at 1014. The court reasoned that the provision did "nothing to bar an AFDC recipient from conceiving and/or bringing to term an additional child, but has merely removed the automatic benefit increase associated with an additional child ..."; accordingly, the court found the cap did not infringe upon plaintiffs' procreative rights. Id. at 1015.
Upon finding that plaintiffs' fundamental right to privacy was not implicated, the court, applying the rational basis test, held that the family cap provision was "rationally related to the legitimate state interests of altering the cycle of welfare dependency... as well as promoting individual responsibility and family stability." Ibid.
In affirming that decision, the Third Circuit stated:
We have nothing to add to the district court's opinion on this point except to observe that it would be remarkable to hold that a state's failure to subsidize a reproductive choice burdens that choice. In short, there are no constitutional implications when the state does not pay a benefit to parents who have a child that it would not pay to parents who did not have a child. Rather than burdening the procreative choice of the plaintiff class, [the family cap] is neutral with respect to that choice.
[C.K. II, 92 F.3d at 195.]
With respect to the equal protection argument, the plaintiff class in C.K. I made a similar argument as the class does here. In this case plaintiffs argue that "certain poor children are denied benefits simply because they were conceived and born while their family was receiving welfare, while similarly situated, equally poor children are provided benefits to meet their basic needs" because their family did not begin receiving welfare until after they were born. They contend that the family cap "denies equal protection by creating classifications of children based on their mothers' exercise of the fundamental right to choose whether and when to have children." In C.K. I, the plaintiffs claimed that the children of welfare recipients were being denied equal protection because they were being penalized for the behavior of their parents. 883 F.Supp. at 1012-13. The court rejected that argument reasoning that the provision did not "completely deprive children of benefits which they may otherwise receive but for the conduct of their parents." Id. at 1013. Rather, *830 the provision merely imposed a cap on the welfare benefits accorded a household while "permitting any additional child to share in that `capped' family income." Ibid. The court explained that the cap was rationally related to a legitimate government purpose:
Placing welfare households on a par with working families is a reasonable and appropriate goal of welfare reform.... The Family Cap, by maintaining the level of AFDC benefits despite the arrival of an additional child, puts the welfare household in the same situation as that of a working family, which does not automatically receive a wage increase every time it produces another child. This in turn reflects the reasoned legislative determination that a ceiling on benefits provides an incentive for parents to leave the welfare rolls for the work force, as any `advantage' of welfare in the form of the per child increase is no longer available.... In addition, it cannot be gainsaid that the Family Cap sends a message that recipients should consider the static level of their welfare benefits before having another child, a message that may reasonably have an ameliorative effect on the rate of out-of-wedlock births that only foster the familial instability and crushing cycle of poverty currently plaguing the welfare class.
[Id. at 1014.]

V
That the family cap provision has withstood challenge under the Federal Constitution, does not necessarily preclude a viable claim under the New Jersey Constitution. "[T]he New Jersey Constitution is not a mirror image of the United States Constitution and there may be circumstances in which the State Constitution provides greater protection." Barone, 107 N.J. at 368, 526 A.2d 1055; State v. Novembrino, 105 N.J. 95, 145, 519 A.2d 820 (1987) ("This Court has frequently resorted to our own State Constitution in order to afford our citizens broader protection of certain personal rights than that afforded by analogous or identical provisions of the federal Constitution.").
When conducting an equal protection analysis under the State Constitution, the New Jersey Supreme Court has employed a balancing test which considers the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction. Greenberg, 99 N.J. at 567, 494 A.2d 294 (citing Right to Choose v. Byrne, 91 N.J. 287, 308-09, 450 A.2d 925 (1982)). "`[W]here an important personal right is affected by government action, [our] Court often requires the public authority to demonstrate a greater `public need' than is traditionally required in construing the federal constitution.'" Byrne, 91 N.J. at 309, 450 A.2d 925 (quoting Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp., 80 N.J. 6, 43, 364 A.2d 1016 (1976)); see Planned Parenthood of Central New Jersey v. Farmer, 165 N.J. 609, 631 n. 6, 762 A.2d 620 (2000) (criticizing the dissent for "improperly" using the degree of the interference with the right as the basis for choosing the applicable level of scrutiny rather than the balancing test enunciated in Byrne) (citation omitted). The balancing test is "particularly appropriate when... the statutory classification indirectly infringes on a fundamental right." Byrne, 91 N.J. at 310, 450 A.2d 925. The test "weigh[s] the governmental interest in the statutory classification against the interests of the affected class." Farmer, 165 N.J. at 630, 762 A.2d 620 (citations omitted). Under this test, the degree of interference is weighed against the State's asserted *831 need for the interference. Id. at 631 n. 6, 762 A.2d 620.
Although the equal protection analysis under the New Jersey Constitution differs somewhat from federal standards, the New Jersey Supreme Court has recognized that the two approaches are "substantially the same" and "will often yield the same result." Drew Assocs. of NJ, LP v. Travisano, 122 N.J. 249, 259, 584 A.2d 807 (1990); Barone, 107 N.J. at 368, 526 A.2d 1055.
To a large extent, the considerations guiding our equal protection analysis under the New Jersey Constitution are implicit in the three tier approach applied by the Supreme Court under the Federal Constitution. Both tests consider the nature of the individual rights affected by the governmental action being challenged, the importance of the governmental interests being furthered, and the degree to which the challenged restriction is necessary to achieve those interests.
[Barone, 107 N.J. at 368, 526 A.2d 1055 (citing Greenberg, 99 N.J. at 567, 494 A.2d 294).]
With regard to a woman's right to privacy and equal protection guarantees, however, the New Jersey Constitution affords greater protection than does its federal counterpart. Farmer, 165 N.J. at 629, 762 A.2d 620 (stating that the language of the State Constitution's equal protection provision is "more expansive" than that of the Federal Constitution and "incorporates within its terms the right of privacy and its concomitant rights, including a woman's right to make certain fundamental choices"); Byrne, 91 N.J. at 292-93, 310, 450 A.2d 925 (holding the equal protection clause of the State Constitution prohibited restricting state Medicaid funding of abortions to only those abortions necessary to preserve the life of the mother, in spite of the United States Supreme Court's decision in Harris v. McRae, 448 U.S. 297, 326, 100 S.Ct. 2671, 2693, 65 L.Ed.2d 784, 811 (1980), which held that the equal protection clause of the United States Constitution did not prohibit the restriction).
To determine whether the family cap comports with the protections afforded by the New Jersey Constitution, we turn first to an examination of the nature of the affected right.[3] Article I, paragraph 1 of the New Jersey Constitution provides:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
[N.J. Const. art. I, ¶ 1.]
The Byrne Court found that this provision protects the right to privacy. 91 N.J. at 303, 450 A.2d 925 (citations omitted). This includes a "woman's right to make certain fundamental choices." Farmer, 165 N.J. at 629, 762 A.2d 620. In Farmer, where plaintiffs challenged a State statute conditioning a minor's right to obtain an abortion on parental notification unless a judicial waiver was obtained, Chief Justice Poritz, writing for the Court, held the statute violated the New Jersey Constitution because the State failed to demonstrate a *832 "real and significant relationship" between the statutory classification and the asserted State interest of protecting immature minors, fostering the family, and preserving parents' rights to rear their children. Id. at 612-13, 762 A.2d 620. In so holding, the Court found that "a [woman's] right to control her reproductive decisions is among the most fundamental rights she possesses...." Id. at 613, 762 A.2d 620; see also J.B. v. M.B., 170 N.J. 9, 23-24, 783 A.2d 707 (2001) (recognizing that the right of procreation is a fundamental right protected by both the Federal and State Constitutions) (citing In re Baby M., 109 N.J. 396, 447, 537 A.2d 1227 (1988)). Clearly, therefore, a woman's privacy right to make reproductive decisions is fundamental and constitutionally protected.
The next question then is to what extent the family cap restricts this right. In Farmer, conditioning a minor's right to obtain an abortion on parental notification was found to be a significant burden upon minors seeking abortions. The restriction in Farmer was direct. Here, the State argues the restrictions upon a woman's right to procreate by the family cap are, at best, indirect and insignificant. As such, we are asked to apply the rational basis test, which is to be applied when the effect on the fundamental right is "indirect or insubstantial." Greenberg, 99 N.J. at 565, 494 A.2d 294. We agree with the State's position. The family cap does not substantially interfere with a woman's right to have children; she may still bear children, albeit without an additional cash subsidy. The failure to provide a cash benefit upon the birth of an additional child does not impair a woman's reproductive rights to any significant degree.
In arriving at our decision, we are provided direction by a number of United States Supreme Court decisions. In Bowen v. Gilliard, 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987), the plaintiffs challenged an amendment requiring that child support be included in the income of AFDC families. With child support included as income, families received a lower benefit than they would have, had the supported child been excluded from the calculations. The plaintiffs argued that as a result of the amendment they were forced to separate their families which substantially interfered with their fundamental right of family association. The Court concluded that although the amendment may have had an effect on family association, the amendment did not "intrude on choices concerning family living arrangements." Bowen, 483 U.S. at 601-02, 107 S.Ct. at 3017, 97 L.Ed.2d at 501 (citation omitted).
Similarly, in Califano v. Jobst, the Court held that Congress could require termination of social security benefits to a disability recipient upon that recipient's marriage, notwithstanding that his spouse, though not a recipient of disability benefits, was also disabled. 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). The Court noted that withholding benefits was not an attempt to interfere with the plaintiff's freedom to marry, despite the possibility that the regulation's effect would deter some people from marrying. Because the statute had a legitimate primary purpose and only an indirect effect on the decision to marry, the Califano Court applied a rational basis test to uphold the denial of benefits. 434 U.S. at 53-58, 98 S.Ct. at 99-102, 54 L.Ed.2d at 235-37.
In Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), the Court applied the strict scrutiny standard to strike down a statute that required persons with court-ordered child support obligations to obtain permission to marry, reasoning that the legislation directly interfered with the individual's fundamental *833 right to marry. The Court went on to observe, however, that the provisions under attack in Califano were not subject to the same standard of review as they "placed no direct legal obstacle in the path of persons desiring to get married, and... there was no evidence that the laws significantly discouraged, let alone made `practically impossible,' any marriages." Id., 434 U.S. at 387 n. 12, 98 S.Ct. at 682 n. 12, 54 L.Ed.2d at 631 n. 12. The Court observed that "reasonable regulations that do not significantly interfere with the marital relationship may legally be imposed." Id., 434 U.S. at 386, 98 S.Ct. at 681, 54 L.Ed.2d at 631.
Our decision in Rinier v. State, 273 N.J.Super. 135, 641 A.2d 276 (App.Div.), certif. denied, 138 N.J. 269, 649 A.2d 1288 (1994), cert. denied, 514 U.S. 1016, 115 S.Ct. 1358, 131 L.Ed.2d 216 (1995), is also instructive. In Rinier, a husband and wife challenged a state law which required them, as a married couple, to file a joint state income-tax return thereby subjecting their aggregate income to a higher tax rate. The plaintiffs argued the law violated their federal due process and equal protection rights. They claimed that by compelling them to file a joint return, they were subject to greater tax liability than unmarried couples who both worked but filed separate returns. In rejecting these claims, we used the rational basis standard:
Plaintiffs argue that the strict scrutiny test should be employed because married persons are a suspect class. We disagree. Government regulations affecting marriage are not subject to strict scrutiny simply because the right to marry is a fundamental right. The government may impose a reasonable regulation on marriages so long as the regulation does not significantly interfere with decisions to marry. Only where the regulation presents a `direct' obstacle to marriage will the court apply a strict scrutiny standard. Here, the challenged provisions of the New Jersey tax place `no direct legal obstacle in the path of persons desiring to get married.' At most, the provisions impose an indirect burden suffered not from marrying, but `from marrying one in a particular income group.' And, while the burden may, to some extent, affect the choice whether to marry, it leaves the ultimate choice to the individual.
[Rinier, 273 N.J.Super. at 141-42, 641 A.2d 276 (citations omitted).]
Here, a similar conclusion is warranted. The family cap provision does not place a direct legal obstacle in the path of a woman's decision to have additional children. By passage of the statute, the State did not deprive women of the right or the ability to have children, but simply chose not to subsidize the increased costs associated with the birth of an additional child. See N.B. v. Sybinski, 724 N.E.2d 1103, 1109 (Ind.Ct.App.), transfer denied, 735 N.E.2d 238 (Ind.2000) (upholding a family cap provision in an Indiana statute on the grounds that Indiana "has merely chosen not to subsidize the parents' fundamental right by removing the automatic benefit increase associated with an additional child under the AFDC Program"); see also C.K. I, 883 F.Supp. at 1014-15. No doubt the statute, to some degree, affects a welfare recipient's decision whether to have another child, just as a decision to have another child by a woman not on welfare is affected by her personal and financial circumstances. But the law does not present a direct obstacle to bearing children. It merely introduces one of many factors that a woman considers when deciding whether to become pregnant and carry the child to term; a choice that remains hers and hers alone. The additional burden imposed by *834 the family cap is not substantial and does not require a heightened level of review.
Nor does the legislation completely deprive either the family unit of the benefits it is already receiving, or eliminate all benefits to the newborn child. Although the welfare recipient will not receive an additional cash stipend for the child, she continues to receive benefits designed to assist her to obtain and retain employment, and significantly, Medicaid coverage and food stamps are provided for the additional child.
In granting summary judgment in favor of the State, the motion judge concluded that the State "demonstrated a legitimate and substantial relationship between the statutory classification and the ends asserted." He found that the purposes of the legislationdiminishing the dependency upon welfare and creating parity between welfare recipients and working peoplegreatly outweighed "[the] slight imposition or mere burden on ... plaintiff's right to privacy." Similarly, the court in C.K. I stated that "[t]he State (and indeed, the societal) interest served by the Family Cap has been well-chronicled...: to give AFDC recipients the same structure of incentives as working people, to promote individual responsibility, and to strengthen and stabilize the family unit." 883 F.Supp. at 1013 (citing N.J.S.A. 44:10-3.7). As we stated in Sanchez v. Department of Human Services, 314 N.J.Super. 11, 17, 713 A.2d 1056 (App. Div.1998), "encouraging employment, individual responsibility and family stability are not only permissible, but laudable state objectives."
We agree with these conclusions. These goals are reasonable and reflect a legislative decision that a ceiling on welfare benefits provides incentives for persons to enter the workforce. It is the Legislature, not the courts, that determines the public need. We should not second guess public officials who are responsible for "allocating limited public welfare funds among the myriad of potential recipients." Dandridge v. Williams, 397 U.S. 471, 485-87, 90 S.Ct. 1153, 1161-62, 25 L.Ed.2d 491, 501-03 (1970) (holding that a program which limits welfare benefits will pass constitutional muster provided it bears a rational relationship to a legitimate state interest); see also Jefferson v. Hackney, 406 U.S. 535, 546-47, 92 S.Ct. 1724, 1731-32, 32 L.Ed.2d 285, 295-96 (1972) (holding that as long as its judgments are rational, a legislature's efforts to "tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggest that there will be more than one constitutional[ly] permissible method of solving them."); see also Sanchez, 314 N.J.Super. at 27, 713 A.2d 1056 (stating that "[s]tates have considerable latitude in allocating their [public assistance] resources....") (citation omitted).
Generally, legislation is presumed valid, and "the burden to prove invalidity is a heavy one." Farmer, 165 N.J. at 619, 762 A.2d 620 (citation omitted). "A legislative act should not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt." Id. at 643-44, 762 A.2d 620 (O'Hern, J., dissenting) (citation omitted). Plaintiffs have not met this burden.
To repeat, the balancing test weighs "the governmental interest against the interests of the affected class." Farmer, 165 N.J. at 630, 762 A.2d 620 (citations omitted). Here, on balance, the benefits to the public by implementing the family capto diminish the dependency on welfare, promote individual responsibility, and strengthen the family unitoutweigh the indirect effect the family cap has upon a *835 woman's decision to bear another child. The Act does not directly effect a woman's fundamental right to become pregnant. It simply reduces the amount of cash that will be available to the family unit upon the birth of the additional child. Job training and job search assistance, vocational educational training, remedial education and GED preparatory classes, N.J.S.A. 44:10-57, as well as additional Medicaid eligibility and food stamps, remain available. N.J.S.A. 44:10-61b; N.J.A.C. 10:90-2.18. The additional children may share in the benefits already available to the family unit.
Considering the legitimate purposes of the WFNJ Act in the context of the broad latitude afforded the State in allocating its financial resources, the decision to eliminate the automatic cash benefit upon the birth of an additional child has a rational basis. Simply put, while the legislation may have removed the automatic benefit associated with the birth of an additional child, it has neither substantially affected a woman's fundamental right to procreate, nor completely deprived the additional children of all benefits.
Plaintiffs argue that according to various studies, the legislation does not accomplish its goals. In support of their position they present evidence that women do not move off welfare more quickly, stay off welfare longer, or earn more money when they leave welfare; nor have the regulations improved poor women's employment prospects. And it cannot be denied that the less money a poor woman has available the more difficult it will be for her to house and feed her children. However, the constitutionality of the family cap does not rest upon its effectiveness so long as it serves a legitimate primary purpose and has a rational basis. That its implementation will result in less cash available to a family receiving welfare is not dispositive. A state "is not obligated to remove obstacles that it did not create, including a lack of financial resources." C.K. I, 883 F.Supp. at 1014 (citing Rust v. Sullivan, 500 U.S. 173, 201, 111 S.Ct. 1759, 1766-77, 114 L.Ed.2d 233, 260-61 (1991)); Harris, 448 U.S. at 317, 100 S.Ct. at 2688, 65 L.Ed.2d at 804-05; see also Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349, 362 (1972). Nor does an individual have a right to government funding. Byrne, 91 N.J. at 307 n. 5, 450 A.2d 925; Dandridge, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (a state is not constitutionally required to provide welfare benefits in an adequate amount or in any amount). If the program is in need of revision in light of the effects it has had upon welfare recipients, that function is best left to the Legislature, not the judiciary.
Affirmed.
NOTES
[1] Two additional plaintiffs, Rosa C. and Crystal D., are not parties to this appeal.
[2] See N.J.S.A. 44:10-34 to -43; N.J.S.A. 44:10-44 to -54; N.J.S.A. 44:10-71 to -78. These provisions are described in the legislation as the Work First New Jersey Program as opposed to the Work First New Jersey Act.
[3] Plaintiffs claim that the family cap (1) violates a woman's right to privacy, and (2) denies equal protection by creating classifications of children based upon their mothers' exercise of their right to choose when to have children, and by discriminating against children based upon their birth status. We consider the issues to be interrelated and for purposes of our analysis we address the right to privacy issue in the context of the Byrne equal protection balancing test.